STATE OF NEBRASKA, APPELLEE, V.
ROGER VAN, APPELLANT.
688 N.W.2d 600

Filed November 12, 2004.   No. S-03-1106.

Melissa A. Wentling, of Wentling Law Office, for appellant.

Jon Bruning, Attorney General, and Kevin J. Slimp for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

STEPHAN, J.

Roger Van was charged in a five-count information with sexual assault in the first degree, assault in the first degree, assault in the second degree, first degree false imprisonment, and terroristic threats. All of the charged offenses were alleged to have been perpetrated upon J.G.C. in Wayne County, Nebraska, from December 8 to 17, 2001. Following a jury trial in the district

court for Wayne County, Van was convicted and sentenced on each of the five counts. He perfected this timely direct appeal.

## I. BACKGROUND

This case arises from what began as a consensual homosexual relationship involving bondage, discipline, and sadomasochism (BDSM). The record reflects that in such relationships, one person is a "master" who exerts control over the life of another, who is referred to as a "submissive" or "slave." Generally, persons entering into such a relationship negotiate its limits and decide on a safe word or signal that can be used to stop the master when the submissive becomes too uncomfortable. The record further reflects that rarely do people enter a BDSM relationship without limits, in which no safe word is used and the submissive yields completely to the control of the master.

In the summer of 2001, J.G.C. resided in Houston, Texas, with F.B. The two men were involved in what they characterized as a "master/slave" relationship. F.B. acted as J.G.C.'s partner, friend, companion, and "master," generally dictating all aspects of J.G.C.'s personal life, but not his professional life. For example, F.B. required J.G.C. to perform most household chores and dictated what clothes J.G.C. would wear outside of work. In addition, J.G.C. wore a collar around his neck and was required to walk behind and slightly to the right of F.B. J.G.C. was not allowed to remove the collar without permission from F.B.

F.B. testified at trial that he and J.G.C. focused on a "master/slave" relationship and did not generally engage in sadomasochistic activities. They did, however, engage in some bondage and discipline activities, including floggings and the use of restraints and gags. F.B. and J.G.C. had a safe word that J.G.C. could invoke if the physical discipline became too intense, but J.G.C. did not invoke the safe word at any time during the relationship.

J.G.C. testified that prior to his relationship with F.B., he had been involved in other BDSM relationships, including a relationship that was initiated over the Internet. In the summer of 2001, he felt that he was not getting enough structure, pain, and discipline from F.B., and he therefore began searching the Internet for a new partner who could give him, in his words, "the treatment that I thought that I deserved for fundamentally being a bad person."

J.G.C. stated he was looking for a "very physically and mentally abusive punishment relationship." J.G.C. conducted this search using a computer at his workplace.

In September 2001, J.G.C. responded to an Internet advertisement posted by Van. After that initial contact, the two exchanged approximately 300 e-mail messages. J.G.C. estimated that he spent approximately 125 hours from September until early December either reading e-mail messages from Van or responding to them. At the beginning of this correspondence, J.G.C. informed Van that he wanted to become a total slave. Over the course of the correspondence, this relationship was defined and understood by both parties to be without limits, to have no safe word, and to be permanent. J.G.C. testified at trial that a submissive cannot end a "no limits" relationship and that he expected to be tortured, humiliated, and to eventually die as a result of his relationship with Van.

Specific punishments were discussed in the e-mail correspondence. J.G.C. stated in one message that he needed to be afraid of Van. In another, J.G.C. mentioned the possibility of being branded by Van and suggested where a brand could be applied to his body. He mentioned his fantasies about being restrained and raped. During their e-mail correspondence, J.G.C. specifically told Van that he may try to escape, but that Van should never allow him to do so and should keep him restrained. In various e-mail messages which he transmitted to Van during this period, J.G.C. indicated that he wanted to be flogged, whipped, beaten, restrained, gagged, shaved, tattooed, pierced, blindfolded, injected with saline, and locked in a cell. He also asked that hot wax be dripped on him, that clothespins be placed on his body and ripped off, and that electronic stimulation be used on him. J.G.C. wrote to Van: "The 'rules' shouldn't apply to true Masters; they should be allowed to do whatever they want whenever they want . . . ." He expressed his anger that "our society today doesn't recognize those rights." In another message, J.G.C. listed "affirmations" that he identified as being important to him with respect to the anticipated relationship with Van, which "affirmations" included the following: "[t]o know that You are the kind of man who will get special pleasure out of flaunting the law; a man who believes that You have the right, and OUGHT to have the right, to do whatever You want without being punished for it."

On December 5, 2001, J.G.C. staged his own abduction by driving his car to New Orleans, Louisiana, leaving it at a restaurant, and taking a bus to Omaha, Nebraska. Prior to "disappearing," J.G.C. deleted all e-mail correspondence with Van from his workplace computer. Jerry Marshall met J.G.C. at the bus station in Omaha on Friday, December 7. Marshall was employed by Van as a delivery driver and maintenance person, and he was also the submissive in a BDSM relationship with Van. When Marshall and J.G.C. arrived in Wayne, J.G.C. was taken through a back entrance into the lower level of Van's floral shop located in that city. After J.G.C. disrobed, he was restrained, blindfolded, and led through several rooms. He was eventually placed face up on a specially designed table and secured by his hands and ankles. He and Van then discussed the context of their relationship, and J.G.C. understood it was to include the punishment, humiliation, and torture they had discussed in their e-mail correspondence. Van then beat J.G.C. lightly and shaved parts of his body. J.G.C. was then taken to a 4- by 6-foot cell, where he was restrained on the floor until the next morning.

Marshall woke J.G.C. on the morning of Saturday, December 8, 2001, and took him to a small basement apartment to use the bathroom, shower, and shave. Marshall then returned J.G.C. to what was referred to as the "dungeon room" and secured him to the aforementioned table located there. Van entered the room, gave J.G.C. a notebook and pen, and instructed him to write down everything he had done wrong in his life. J.G.C. understood that what he wrote was to be the basis of his future punishments. J.G.C. testified that as he worked on this writing assignment, he began to realize that he was not a bad person, as he had previously believed, and did not need to be punished. He described this as a "huge catharsis" which caused him to decide that he wanted to return to his life in Houston. J.G.C. testified that at this point, he decided to end the relationship with Van, and he therefore told Marshall that he needed to speak with Van.

When Van came into the dungeon room approximately 20 minutes later, J.G.C. informed him that he had made a mistake and no longer wished to continue their relationship. J.G.C. described Van's demeanor at this time as "very calm" and testified that Van mentioned their prior e-mail correspondence in which J.G.C. had

directed Van not to allow him to escape if he attempted to do so. At the end of the conversation, Van said he was not sure what to do and returned to his floral shop upstairs. Marshall testified that at that point, Van told Marshall that J.G.C. "had had a moment or a slip." The two then reviewed the e-mail correspondence between Van and J.G.C. to confirm that J.G.C. had instructed Van not to allow J.G.C. to leave, even if he requested to leave.

J.G.C. testified that after about 20 minutes, Marshall came into the dungeon room and dragged J.G.C. back to the cell, indicating that if J.G.C. "screwed up" again, he would be killed and buried in the cell. Marshall then took J.G.C. to another room and beat him with a belt. Van then returned, and he and Marshall took J.G.C. to the dungeon room where they strapped him to the table. At that time, Van informed him that he would be severely punished for trying to escape. Van and Marshall then gagged and blindfolded J.G.C., beat him, ripped clothespins off his body, stuck him with pins, and flogged and whipped him. After approximately an hour, he was returned to the cell.

On the morning of Sunday, December 9, 2001, after permitting J.G.C. to shower and shave, Marshall returned him to the dungeon room and locked him down on the table. Some time later, Van entered the room and told J.G.C. that he hoped he had learned his lesson and would never try to escape again. J.G.C. replied that he was sorry he had disappointed Van. Van then forced J.G.C. to listen to an audiotape of Van's voice repeatedly telling J.G.C. that he was a bad person and needed to be punished. J.G.C. had suggested such an audiotape in one of his e-mail messages. Van also informed J.G.C. that a video camera in the room enabled Van to watch J.G.C. at all times and that if he continued to be disobedient, Van would kill him. After listening to the audiotape for most of the day, J.G.C. was returned to the cell and shackled.

On the morning of Monday, December 10, 2001, J.G.C. was strapped to the table in the dungeon room and required to listen to the audiotape. Several times during that day and evening, Van administered what J.G.C. considered "light" spankings and beatings.

On the following day, J.G.C. was again required to listen to the audiotape. That evening, Van strapped J.G.C. to the table, gagged him, and administered six or seven injections of saline solution into his scrotum. After the injections, Van subjected J.G.C. to a

"light beating" for approximately 30 minutes. J.G.C. was then returned to the cell for the night.

On the morning of Wednesday, December 12, 2001, Marshall told J.G.C. that Van had some plans for him. Marshall later took J.G.C. to a small room where a computer was located and taught him to enter information related to Van's business into a software program. While working at the computer, J.G.C. drafted a message to a friend in Houston stating that he was being held against his will by Van in Wayne, Nebraska. J.G.C. testified that he intended to transmit this message by e-mail when Marshall was not looking. Before J.G.C. could attempt an Internet connection, however, Marshall returned and discovered the message. At that point, Marshall returned J.G.C. to the cell and told him that Van needed to be informed of the message.

Marshall testified that after he reported this incident, Van had a private conversation with J.G.C. for approximately 30 minutes. Afterward, Van reported to Marshall that J.G.C. was unhappy because his previous BDSM sessions had not been sufficiently intense. At that point, Marshall and Van returned J.G.C. to the dungeon room where they locked him on the table. After blindfolding and gagging J.G.C., Van and Marshall beat him severely using a whip, a flogger, pins, hot wax, and clothespins. Marshall and Van then removed J.G.C. from the table, secured his hands to an overhead beam so that he hung by his wrists, and beat him for 10 to 15 minutes. After the beating, Van informed J.G.C. that every time he made a mistake, the punishment would be more severe until Van became tired of it and decided to kill him.

On several evenings, J.G.C. was required to give Van a massage. J.G.C. testified that after one of these sessions, on the evening of either December 10 or 11, 2001, Van anally penetrated him. J.G.C. testified that he did not consent to this act, but did not resist either verbally or physically because of the threats which Van had made previously. J.G.C. further testified that Van anally penetrated him again on or after December 12.

J.G.C. testified that on either December 14 or 15, 2001, Van placed him on the table in a prone position, blindfolded and gagged him, and then said that he intended to brand him as his property. J.G.C. testified that a few minutes later a brand was applied to his right thigh, causing intense pain.

On the morning of Sunday, December 16, 2001, Marshall approached J.G.C. and asked if he was being held against his will. Marshall testified that he had difficulty making it clear to J.G.C. that his inquiry was "out of the game." Eventually, J.G.C. told Marshall that he did want to leave, and the two devised an escape plan. When Van left later in the day, J.G.C. and Marshall made it appear that J.G.C. had forced his way out of the basement. This plan was meant to protect Marshall from possible retribution by Van. Marshall then took J.G.C. to the home of a friend who loaned J.G.C. money for a bus ticket to Houston.

At that point, Marshall telephoned F.B. and informed him that he had J.G.C. with him and that they would be calling again. Marshall then drove J.G.C. to Omaha. While they were waiting for the next bus to Houston, Marshall telephoned F.B. again, and this time J.G.C. spoke to F.B. During this conversation, J.G.C. informed F.B. that he had left Houston of his own accord but wanted to come home. After J.G.C. boarded the bus, Marshall called F.B. a third time to advise him that J.G.C. was en route.

F.B. notified J.G.C.'s father that J.G.C. was returning to Texas. When he arrived in Dallas, Texas, on Monday, December 17, 2001, J.G.C. was met by F.B., his father, and another man, who drove him to Houston. En route, J.G.C. told F.B. and his father about some of the events which had occurred in Wayne but did not go into detail out of embarrassment and a desire to protect Marshall. Upon arriving in Houston, J.G.C. gave a statement to police in which he did not identify Van or Marshall by name. He left with the understanding that without additional information, Houston police would be unable to conduct any further investigation.

The next day, at the urging of his father, J.G.C. gave a taped statement to Houston police identifying Van and Marshall, who were subsequently arrested. Marshall was originally charged with one count of second degree assault, one count of third degree assault, one count of terroristic threats, and one count of false imprisonment. He pled guilty to one charge of third degree assault in exchange for his testimony against Van.

Additional facts relevant to our analysis of Van's assignments of error will be set forth therein.

## II. ANALYSIS

### 1. CONSTITUTIONALITY OF STATUTES

#### (a) Assignments of Error

In his first assignment of error, Van assigns, restated, that Neb. Rev. Stat. §§ 28-319(1)(a), 28-308, 28-309, 28-314, and 28-311.01 (Reissue 1995 & Cum. Supp. 2002), which define the offenses of sexual assault in the first degree, assault in the first degree, assault in the second degree, false imprisonment in the first degree, and terroristic threats, respectively, are unconstitutional as applied to him because they violate his right to privacy guaranteed by the Due Process Clauses of both the Nebraska and U.S. Constitutions, and because the statutes were arbitrarily, capriciously, and discriminatorily applied to him.

In his second assignment of error, Van assigns, restated, that Nebraska's rape shield law, Neb. Rev. Stat. § 28-321 (Reissue 1995), is unconstitutional as applied to him.

#### (b) Standard of Review

█ Whether a statute is constitutional is a question of law; accordingly, the Nebraska Supreme Court is obligated to reach a conclusion independent of the decision reached by the trial court. *State v. Gales*, 265 Neb. 598, 658 N.W.2d 604 (2003); *State v. Spady*, 264 Neb. 99, 645 N.W.2d 539 (2002).

█ A statute is presumed to be constitutional, and all reasonable doubts will be resolved in favor of its constitutionality. *State v. Worm*, ante p. 74, 680 N.W.2d 151 (2004); *State v. Spady, supra*. The burden of establishing a statute's unconstitutionality is on the party claiming it to be unconstitutional. *State v. Spady, supra*.

#### (c) Disposition

##### (i) Charging Statutes

Van contends that the statutes defining the criminal offenses of which he was convicted are unconstitutional as applied to him because the "Nebraska legislature did not intend these statutes to apply to conduct that occurs during a private, consensual relationship involving BDSM activities." Brief for appellant at 20. Van argues that the events that occurred in his basement "are almost identical to the BDSM relationship discussed and negotiated in the

emails" in which J.G.C. "appeared to be a willing participant." *Id.* at 18. He argues that he and J.G.C. were "two adults who, with complete and mutual consent, engaged in sexual practices common to their homosexual, BDSM lifestyle." *Id.* at 22.

Van rests his legal argument on *Lawrence v. Texas*, 539 U.S. 558, 123 S. Ct. 2472, 156 L. Ed. 2d 508 (2003), which was decided after Van's trial but prior to his sentencing. In *Lawrence*, the U.S. Supreme Court considered the validity of a Texas criminal statute prohibiting two persons of the same sex from engaging in certain intimate sexual conduct. The two adult men convicted under the statute had engaged in consensual sexual activity in a private residence. Overruling *Bowers v. Hardwick*, 478 U.S. 186, 106 S. Ct. 2841, 92 L. Ed. 2d 140 (1986), the Court recognized that "liberty gives substantial protection to adult persons in deciding how to conduct their private lives in matters pertaining to sex" and held that the Texas statute furthered "no legitimate state interest which can justify its intrusion into the personal and private life of the individual." *Lawrence v. Texas*, 539 U.S. at 572, 578. The Court noted that as a "general rule," government should not attempt to define the meaning or set the boundaries of a personal relationship "absent injury to a person or abuse of an institution the law protects." 539 U.S. at 567.

In *Lawrence*, the consensual nature of the sexual activity was undisputed. In the instant case, consent was very much at issue. The offenses with which Van was charged were alleged to have been committed from December 8 to 17, 2001, after J.G.C. claimed to have withdrawn his initial consent to the relationship with Van and expressed his desire to return to Texas. In order to obtain a conviction on the charge of sexual assault in the first degree, the State was required to prove beyond a reasonable doubt that sexual penetration occurred without J.G.C.'s consent. See § 28-319(1)(a). We find nothing in *Lawrence* to even remotely suggest that nonconsensual sexual conduct is constitutionally protected under any circumstances or that consent, once given, can never be withdrawn.

Our statutes defining first and second degree assault include no reference to consent. Van was charged with assault in the first degree, defined by § 28-308(1), which provides: "A person commits the offense of assault in the first degree if he intentionally or

knowingly causes serious bodily injury to another person." He was also charged with violating § 28-309, which defines assault in the second degree as "[i]ntentionally or knowingly" causing "bodily injury to another person with a dangerous instrument." This court has held that "all attempts to do physical violence which amount to a statutory assault are unlawful and a breach of the peace, and a person cannot consent to an unlawful assault." *State v. Hatfield*, 218 Neb. 470, 474, 356 N.W.2d 872, 876 (1984). Although we have not previously had occasion to determine the applicability of this principle to a BDSM relationship, other courts have done so. For example, in *People v. Jovanovic*, 263 A.D.2d 182, 198 n.5, 700 N.Y.S.2d 156, 168 n.5 (1999), a case involving alleged conduct which occurred after e-mail correspondence in which the complainant had indicated an interest in participating in sadomasochism, the court noted that under New York law, consent was not a defense to the crime of assault because "as a matter of public policy, a person cannot avoid criminal responsibility for an assault that causes injury or carries a risk of serious harm, even if the victim asked for or consented to the act."

In *State v. Collier*, 372 N.W.2d 303, 305 (Iowa App. 1985), the Iowa Court of Appeals held that BDSM activity did not fall within an exception to the Iowa assault statute as conduct by voluntary participants in a "sport, social or other activity" which did not create an "unreasonable risk of serious injury or breach of the peace." (Emphasis omitted.) The court in *Collier* held:

> Whatever rights the defendant may enjoy regarding private sexual activity, when such activity results in the whipping or beating of another resulting in bodily injury, such rights are outweighed by the State's interest in protecting its citizens' health, safety, and moral welfare. . . . A state unquestionably has the power to protect its vital interest in the preservation of public peace and tranquility, and may prohibit such conduct when it poses a threat thereto.

(Citations omitted.) 372 N.W.2d at 307.

The Supreme Judicial Court of Massachusetts used similar reasoning in rejecting the defendant's argument that he was not guilty of assault and battery because he and the victim were engaged in a sadomasochistic relationship in which beatings administered with a riding crop were for sexual gratification.

*Commonwealth v. Appleby,* 380 Mass. 296, 402 N.E.2d 1051 (1980). The court held that any right to sexual privacy held by a citizen "would be outweighed in the constitutional balancing scheme by the State's interest in preventing violence by the use of dangerous weapons upon its citizens under the claimed cloak of privacy in sexual relations." *Id.* at 310, 402 N.E.2d at 1060. See, also, *People v. Samuels,* 250 Cal. App. 2d 501, 58 Cal. Rptr. 439 (1967) (holding consent not defense to aggravated assault charge arising from filmed sadomasochistic beating).

Although *Lawrence v. Texas,* 539 U.S. 558, 123 S. Ct. 2472, 156 L. Ed. 2d 508 (2003), was decided subsequent to these cases, it does not undermine their reasoning. The *Lawrence* Court did not extend constitutional protection to *any* conduct which occurs in the context of a consensual sexual relationship. Rather, the Court indicated that State regulation of such conduct was inappropriate "absent injury to a person or abuse of an institution the law protects." 539 U.S. at 567. In addition, it specifically noted that the case it was deciding did not involve "persons who might be injured." 539 U.S. at 578. We therefore conclude that §§ 28-308 and 28-309 are not unconstitutional as applied to Van.

■ We note that Van also argues that the assault statutes are arbitrarily applied, in that their literal application would criminalize such things as surgeries, tattoos, and body piercing. We regard this argument as a facial challenge to the constitutionality of the assault statutes. See *State v. Kelley,* 249 Neb. 99, 541 N.W.2d 645 (1996) (challenge that statute vests unbridled discretion in county attorney is facial). Van did not, however, file a motion to quash in district court. A facial challenge to a statute is waived if a party fails to file a timely motion to quash in the district court. *State v. Caddy,* 262 Neb. 38, 628 N.W.2d 251 (2001). We therefore do not reach the issue of arbitrary application.

Van was also convicted of committing terroristic threats and first degree false imprisonment. "A person commits terroristic threats if he or she threatens to commit any crime of violence . . . [w]ith the intent to terrorize another." § 28-311.01(1)(a). A person commits false imprisonment under § 28-314(1) if he or she "knowingly restrains or abducts another person (a) under terrorizing circumstances or under circumstances which expose the person to the risk of serious bodily injury; or (b) with intent to hold

him in a condition of involuntary servitude." Like the assault statutes, the object of these criminal statutes is to protect citizens from injury and to maintain public order, institutions which the law does and should protect. We do not interpret *Lawrence* as restricting the ability of the State to regulate such conduct through its criminal laws and, accordingly, conclude that neither statute is unconstitutional as applied to Van.

### (ii) Rape Shield Law

Nebraska's rape shield law, codified at § 28-321, provides in relevant part that evidence of a victim's past sexual behavior is not admissible except as follows:

> Evidence of past sexual behavior with persons other than the defendant, offered by the defendant upon the issue whether the defendant was or was not, with respect to the victim, the source of any physical evidence [or] evidence of past sexual behavior with the defendant when such evidence is offered by the defendant on the issue of whether the victim consented to the sexual behavior upon which the sexual assault is alleged if it is first established to the court that such activity shows such a relation to the conduct involved in the case and tends to establish a pattern of conduct or behavior on the part of the victim as to be relevant to the issue of consent.

Prior to trial, the State filed a motion to exclude evidence of J.G.C.'s past sexual behavior pursuant to § 28-321, on grounds that there was no sexual activity between J.G.C. and Van prior to December 7, 2001, and that J.G.C.'s sexual behavior prior to that date was irrelevant. Following an evidentiary hearing on the motion, the district court entered an order determining that the details of J.G.C.'s prior sexual activity, including events, dates, and partners, were inadmissible under the rape shield law. However, relying upon *State v. Lessley*, 257 Neb. 903, 601 N.W.2d 521 (1999), and *State v. Johnson*, 9 Neb. App. 140, 609 N.W.2d 48 (2000), the court concluded that under the Confrontation Clause of the Fifth Amendment, Van had the right to inquire generally at trial whether J.G.C. had previously engaged in BDSM activities with persons other than Van.

Van contends that the limitations which the district court imposed upon his right to cross-examine J.G.C. cause the rape

shield law to be unconstitutional as applied to him, arguing that if he "had been allowed to fully cross examine [J.G.C.], a reasonable jury would have a 'significantly different impression of [J.G.C.'s] credibility.' " Brief for appellant at 27, quoting *State v. Johnson, supra.* He contends that "the rejected evidence of [J.G.C.'s] prior consensual BDSM behavior was so relevant and probative that it triggered Van's constitutional right to present such evidence." Brief for appellant at 27.

■ However, the substance of this "rejected evidence" is not apparent from the record. At trial, Van cross-examined J.G.C. extensively about his prior BDSM activities, including specific information about his relationship with F.B. He made no offer of proof with respect to any additional facts he sought to elicit from J.G.C. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected and the substance of the evidence was made known to the judge by offer or was apparent from the context within which questions were asked. Neb. Evid. R. 103(1), Neb. Rev. Stat. § 27-103(1) (Reissue 1995); *State v. Cook*, 266 Neb. 465, 667 N.W.2d 201 (2003). Van has not preserved an issue with respect to exclusion of specific evidence pertaining to J.G.C.'s prior sexual history, and thus we do not reach his claim that the rape shield law is unconstitutional as applied to him.

## 2. SUFFICIENCY OF INFORMATION

### (a) Assignment of Error

In his third assignment of error, Van assigns, restated, that the district court erred in finding no error of law or irregularities at trial with regard to the State's use of a "blanket" information which did not specify particular facts as applied to each charged offense.

### (b) Standard of Review

■ When dispositive issues on appeal present questions of law, an appellate court has an obligation to reach an independent conclusion irrespective of the decision made by the court below. *State v. Hubbard*, 267 Neb. 316, 673 N.W.2d 567 (2004); *State v. March*, 265 Neb. 447, 658 N.W.2d 20 (2003).

### (c) Disposition

The information filed in this case alleged that Van committed the charged offenses in Wayne County "on or about December 8, 2001 to December 17, 2001." Each charged offense was described in the information using the language of the statute by which it was defined. At trial, Van did not specifically object to the form of the information, but did object to all the evidence being presented without specifying which evidence related to which count. During the hearing on his motion for new trial, Van argued, inter alia, that the information violated his double jeopardy rights. Generally, on appeal, he now argues that the information was deficient because it failed to specify the particular facts that supported each of the two assault charges. Relying upon *State v. Bachelor*, 6 Neb. App. 426, 575 N.W.2d 625 (1998), Van contends that there is no way of knowing what evidence the jury used to support its guilty verdict with respect to the charges of first and second degree assault.

*Bachelor* did not involve a challenge to the sufficiency of an information, but, rather, a contention that third degree assault was a lesser-included offense of second degree assault, such that conviction of both offenses arising out of the same conduct would constitute double jeopardy. Van was charged with and convicted of first and second degree assault, which we have held are separate offenses for double jeopardy purposes. See *State v. Billups*, 209 Neb. 737, 311 N.W.2d 512 (1981). *Bachelor* does not support Van's argument that an information alleging multiple counts must allege specific evidentiary facts relevant to each count.

The function of an information is twofold: With reasonable certainty, an information must inform the accused of the crime charged so that the accused may prepare a defense to the prosecution and, if convicted, be able to plead the judgment of conviction on such charge as a bar to a later prosecution for the same offense. *State v. Brunzo*, 262 Neb. 598, 634 N.W.2d 767 (2001). Generally, to charge a defendant with the commission of a criminal offense, the information or complaint must allege each statutorily essential element of the crime charged, expressed in the words of the statute which prohibits the conduct charged as a crime, or in language equivalent to the statutory terms defining the crime charged. *Id.* Where an information alleges the commission of a crime using language of the statute defining that crime

or terms equivalent to such statutory definition, the charge is sufficient. *Id.* However, when the charging of a crime in the language of the statute leaves the information insufficient to reasonably inform the defendant as to the nature of the crime charged, additional averments must be included to meet the requirements of due process. *Id.* Nonetheless, an information is deemed sufficient unless it is so defective that by no construction can it be said to charge the offense of which the accused was convicted. *Id.*

Here, the information charges that five crimes were committed in Wayne County during a 10-day timeframe and describes the statutorily essential elements of each crime in the words of the statute that defines each charged offense, or language equivalent thereto. We conclude that the information was legally sufficient to accomplish its dual purpose as articulated in *State v. Brunzo, supra.*

### 3. MOTION FOR MISTRIAL

#### (a) Assignment of Error

In his fourth assignment of error, Van assigns, restated, that the district court erred in denying his motion for a mistrial following certain testimony by Marshall which the court ordered stricken.

#### (b) Standard of Review

The decision whether to grant a motion for mistrial is within the discretion of the trial court and will not be disturbed on appeal in the absence of an abuse of discretion. *State v. Cook,* 266 Neb. 465, 667 N.W.2d 201 (2003); *State v. Shipps,* 265 Neb. 342, 656 N.W.2d 622 (2003).

#### (c) Disposition

During trial, the district court conducted a hearing out of the presence of the jury to determine whether evidence relating to Van's prior sexual conduct with Marshall and others was admissible under Neb. Evid. R. 404, Neb. Rev. Stat. § 27-404 (Reissue 1995). The court concluded that evidence relating to Van's relationship with Marshall was not subject to rule 404, as it occurred during the time of the conduct involving J.G.C. and Marshall was essentially a codefendant. The court specifically found, however, that evidence of Van's conduct with other individuals was inadmissible under rule 404.

During direct examination by the State, Marshall testified about a conversation he had had with Van about J.G.C. on Thursday, December 13, 2001. Marshall testified that they discussed the events of the previous day and J.G.C.'s progress as a "slave." Marshall testified that during this conversation, Van stated that if J.G.C. did not work out, they would have to kill him. Marshall testified that Van appeared to be disappointed when he made this statement. When the State asked Marshall the reason for Van's apparent disappointment, he responded, "[Van] had told me that what his goal was is to eventually get seven slaves and it was—." At that point, Van's counsel immediately objected and moved for a mistrial on the basis that Marshall had testified regarding Van's behavior with others in violation of the court's finding at the rule 404 hearing. The district court denied the motion but instructed the jury to disregard Marshall's response.

On appeal, Van contends that Marshall's statement was so prejudicial that it could not be cured by the instruction to disregard and that the district court therefore erred in not granting a mistrial. A mistrial is properly granted in a criminal case where an event occurs during the course of a trial which is of such a nature that its damaging effect cannot be removed by proper admonition or instruction to the jury and thus prevents a fair trial. *State v. Shipps, supra; State v. Myers*, 258 Neb. 272, 603 N.W.2d 390 (1999). Marshall's brief remark did not include specifics about Van's prior sexual conduct with other individuals, and we conclude that it does not rise to the level of prejudice that would require a mistrial. The instruction to disregard was sufficient to minimize any prejudice caused by the remark, and the district court did not err in denying Van's motion for mistrial.

### 4. ASSISTANCE OF COUNSEL

#### (a) Assignment of Error

In his fifth assignment of error, Van assigns, restated, that his trial counsel was ineffective, thereby depriving him of his Sixth Amendment right to assistance of counsel.

#### (b) Standard of Review

To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052,

80 L. Ed. 2d 674 (1984), the defendant must show that counsel's performance was deficient and that this deficient performance actually prejudiced his or her defense. *State v. Duncan*, 265 Neb. 406, 657 N.W.2d 620 (2003); *State v. Davlin*, 265 Neb. 386, 658 N.W.2d 1 (2003). Claims of ineffective assistance of counsel raised for the first time on direct appeal do not require dismissal ipso facto; the determining factor is whether the record is sufficient to adequately review the question. *State v. Hubbard*, 267 Neb. 316, 673 N.W.2d 567 (2004). When the issue has not been raised or ruled on at the trial court level and the matter necessitates an evidentiary hearing, an appellate court will not address the matter on direct appeal. *Id.*

### (c) Disposition

Van alleges that his trial counsel was ineffective in agreeing to redact specific details in the e-mail messages received in evidence at trial, in failing to file a bill of particulars or a motion to quash the assault charges in the information, in failing to request a change of venue, and in failing to challenge discrimination in the selection of the jury. Van concedes in his brief that these claimed deficiencies are "not apparent on the record." Brief for appellant at 30.

Based upon our determination, discussed above, that the information was legally sufficient, we conclude that there is no merit to Van's claim that his trial counsel was ineffective in failing to file a bill of particulars or motion to quash. We agree that the present record provides an insufficient basis for resolution of Van's other claims regarding the assistance provided by his trial counsel. Accordingly, we do not reach those issues in this direct appeal.

### 5. Sentencing

### (a) Assignment of Error

In his sixth assignment of error, Van assigns that the district court erred "in failing to impose concurrent sentences . . . and imposing an excessive sentence, which constituted an abuse of its discretion."

### (b) Standard of Review

In imposing a sentence, a sentencing judge should consider the defendant's age, mentality, education, experience, and

social and cultural background, as well as his or her past criminal record or law-abiding conduct, motivation for the offense, nature of the offense, and the amount of violence involved in the commission of the crime. *State v. Roeder*, 262 Neb. 951, 636 N.W.2d 870 (2001); *State v. Decker*, 261 Neb. 382, 622 N.W.2d 903 (2001). Where a sentence imposed within statutory limits is alleged on appeal to be excessive, the appellate court must determine whether the sentencing court abused its discretion in considering and applying these factors as well as any applicable legal principles in determining the sentence to be imposed. *Id.* An abuse of discretion takes place when the sentencing court's reasons or rulings are clearly untenable and unfairly deprive a litigant of a substantial right and a just result. *Id.*

(c) Disposition

All of Van's sentences were within statutory limits. First degree sexual assault is a Class II felony, which carries a minimum prison sentence of 1 year and a maximum of 50 years. Neb. Rev. Stat. § 28-105 (Cum. Supp. 2002) and § 28-319(2). Van was sentenced to 7 to 10 years in prison on this charge. First degree assault is a Class III felony and carries a minimum prison sentence of 1 year and a maximum of 20 years. §§ 28-105 and 28-308(2). Van was sentenced to 5 to 8 years in prison for first degree assault. Second degree assault and false imprisonment are Class IIIA felonies which carry no minimum sentence and a maximum prison sentence of 5 years. §§ 28-105, 28-309, and 28-314. Van received prison sentences of 2 to 5 years for second degree assault and 1 to 3 years for false imprisonment. Terroristic threats is a Class IV felony which carries no minimum sentence and a maximum sentence of 5 years in prison. §§ 28-105 and 28-311.01(2). Van received a prison sentence of 1 to 3 years for terroristic threats. The sentences were ordered to be served consecutively.

In arguing that these sentences were excessive, Van contends that all of the charged offenses arose from a single "transaction" which he describes as a "consensual and prearranged BDSM relationship" initiated by J.G.C. Brief for appellant at 31. This argument ignores J.G.C.'s sworn testimony that at the time of the charged offenses, he had withdrawn any consent previously communicated to Van. Nor do we find merit in Van's argument

that his sentences are excessive when compared to the sentence received by Marshall. The mere fact that a defendant's sentence differs from that imposed on a coperpetrator does not in and of itself make the defendant's sentence an abuse of discretion, as the court must consider each defendant's life, character, and previous conduct in imposing sentence. *State v. Boppre*, 234 Neb. 922, 453 N.W.2d 406 (1990).

Based upon our review of the record, including the presentence investigation report reflecting Van's prior history of sexual offenses, we conclude that the district court did not abuse its discretion in sentencing Van to consecutive terms of imprisonment as noted above.

### 6. DENIAL OF MOTION FOR NEW TRIAL

#### (a) Assignments of Error

Van's remaining assignments of error pertain to the denial of his motion for new trial. In his seventh assignment of error, Van asserts that the district court erred in failing to find that the verdict was not supported by sufficient evidence or was contrary to law. In his eighth assignment of error, Van alleges prosecutorial misconduct for not disclosing certain evidence prior to trial. In his ninth assignment of error, Van asserts that the trial court erred in refusing a juror affidavit offered in support of his motion for new trial and further erred in not remanding for a new trial or at least for an evidentiary hearing on this issue. In his 10th assignment of error, Van assigns that the district court erred in denying him a new trial based upon newly discovered evidence.

#### (b) Standard of Review

A motion for new trial is addressed to the discretion of the trial court, whose decision will be upheld in the absence of an abuse of that discretion. *State v. Hudson, ante* p. 151, 680 N.W.2d 603 (2004). Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder

of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Cook*, 266 Neb. 465, 667 N.W.2d 201 (2003).

### (c) Disposition

### *(i) Sufficiency of Evidence*

#### a. Terroristic Threats

With respect to the terroristic threats charge, Van argues that J.G.C. stated in the e-mail correspondence and admitted on cross-examination that he needed to be afraid of Van. Van argues that his conduct cannot be a terroristic threat "when [J.G.C.], the victim, is asking Van to threaten him, to make him afraid of Van." Brief for appellant at 32. We view this as a restatement of Van's contention that because J.G.C. originally consented to the BDSM relationship, Van cannot be convicted of terroristic threats. We find no merit in this argument.

"A person commits terroristic threats if he or she threatens to commit any crime of violence . . . [w]ith the intent to terrorize another." § 28-311.01(1)(a). In *State v. Saltzman*, 235 Neb. 964, 458 N.W.2d 239 (1990), we held that the terroristic threats statute required neither an actual intent to execute the threats made nor that the recipient of the threat actually be terrorized. Because the State was not required to prove J.G.C. was actually terrorized, the only issue for the jury was whether Van possessed the intent to terrorize him. There was evidence that Van threatened J.G.C.'s life, which is sufficient to support the conviction for terroristic threats.

#### b. False Imprisonment

Van argues that because J.G.C. admitted the possibility that Van did not understand that J.G.C. really wanted to go home, there was insufficient evidence for the jury to find Van guilty of false imprisonment. Under Nebraska law, a person commits false imprisonment in the first degree "if he or she knowingly restrains or abducts another person (a) under terrorizing circumstances or under circumstances which expose the person to the risk of serious bodily injury; or (b) with intent to hold him or her in a condition of involuntary servitude." § 28-314(1). The statute contains no express "lack of consent" element, but it does require an

inquiry into whether the restraint was "knowingly" done. Subsection (1)(b) would require a further inquiry into Van's intent. Regardless of J.G.C.'s belief, the issue of Van's knowledge and intent was for the jury to decide. Because J.G.C. testified that he told Van that he wished to go home, there was sufficient evidence upon which the jury could conclude that Van acted with the requisite knowledge and intent.

### c. Sexual Assault

As noted, consent is clearly a defense to the sexual assault charge. In this respect, Van argues that the only evidence in the record is that J.G.C. neither physically nor verbally resisted the assault and that thus, he consented to it. However, under Neb. Rev. Stat. § 28-318(8) (Reissue 1995), the phrase "without consent" within the context of § 28-321 can mean compulsion to submit "due to the use of force or threat of force." In addition, "[a] victim need not resist verbally or physically where it would be useless or futile to do so." § 28-318(8). The jury was instructed on these definitions. Thus, the mere fact that J.G.C. did not verbally or physically resist is not determinative of whether he consented to the acts. The record includes evidence that J.G.C. was subject to beatings for disobeying Van and that he revoked his consent to the BDSM relationship prior to the acts of sexual penetration. Thus, the evidence was sufficient to support Van's conviction on this charge.

### d. First and Second Degree Assault

Although Van makes a general assignment that the jury's verdict was not supported by sufficient evidence, he makes no specific argument in this regard with respect to the assault convictions. Errors that are assigned but not argued will not be addressed by an appellate court. *State v. Perry, ante* p. 179, 681 N.W.2d 729 (2004); *State v. Jackson*, 264 Neb. 420, 648 N.W.2d 282 (2002).

### (ii) Alleged Prosecutorial Misconduct

The suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. *Brady v. Maryland,*

373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); *State v. Castor*, 257 Neb. 572, 599 N.W.2d 201 (1999). Favorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different. *Id.* Whether a prosecutor's failure to disclose evidence results in prejudice depends on whether the information sought is material to the preparation of the defense, meaning that there is a strong indication that such information will play an important role in uncovering admissible evidence, aiding preparation of witnesses, corroborating testimony, or assisting impeachment or rebuttal. *State v. Null*, 247 Neb. 192, 526 N.W.2d 220 (1995). Van argues that the State failed to disclose three categories of evidence prior to his trial.

### a. Polygraph Examination Notes

Van filed a pretrial motion to disclose the results of a polygraph test administered to J.G.C. This motion was sustained on June 21, 2002. Van concedes in this brief that he received polygraph information from the State prior to trial. Van contends, however, that the information provided to him was incomplete. Specifically, he contends that one section of this information, captioned "PRE-TEST ADMISSIONS," states "See notes" and that he was never provided with any notes. Brief for appellant at 34. He argues that the failure of the State to provide the notes unfairly limited his ability to cross-examine J.G.C. concerning prior inconsistent statements.

At the hearing on the motion for new trial, the State offered an affidavit from an officer of the Wayne Police Department averring that all of the materials related to the polygraph report were provided to Van. Van offered no evidence to the contrary. The State could not have failed to disclose information which did not exist. Accordingly, Van's argument in this regard is without merit.

### b. Statements of J.G.C. and Marshall

Van filed a pretrial motion to disclose exculpatory and mitigating evidence, which was sustained by the trial court prior to trial. In his brief, Van contends that at trial, both Marshall and J.G.C. testified that they had previously lied to law enforcement officers and that the State failed to provide him with this information prior

to trial, thus prejudicing his ability to cross-examine the witnesses. The State argues that Van has presented no evidence in support of his contention that it failed to provide him with information regarding J.G.C.'s and Marshall's statements prior to trial. Moreover, it is clear from the record that Van was provided the information he now complains about while the trial was progressing, when both J.G.C. and Marshall testified about their prior lies. Because Van possessed the information during trial, any delay in receiving the information could not have impaired his ability to cross-examine the witnesses. See *State v. Lotter*, 255 Neb. 456, 586 N.W.2d 591 (1998) (holding no *Brady* violation exists when material evidence is disclosed prior to end of trial).

### c. Evidence Pertaining to Anita Reeves

During his cross-examination on July 10, 2002, J.G.C. denied that he knew a person named "Anita Reeves" and denied that he had ever told anyone at a Houston church that he intended to go to New Orleans. During redirect on July 11, the State did not question J.G.C. regarding these statements.

On July 12, 2002, while the trial was still in progress, a Wayne police officer conducted a telephone interview with Reeves. During this interview, it was discovered that Reeves had contacted the Houston police in December 2001 to report that she had had contact with J.G.C. at a church in Houston and that J.G.C. stated he was going to New Orleans. The State immediately provided this information to Van. Van now contends that the State knowingly permitted J.G.C. to falsely testify because it knew the contents of the police interview contradicted J.G.C.'s testimony.

The record reflects that the State did not acquire the information regarding Reeves until after J.G.C.'s trial testimony. Prosecutors therefore could not have knowingly allowed J.G.C. to testify falsely with respect to Reeves. In addition, the interview was based only on Reeves' unsworn statements and thus cannot be said to have rendered J.G.C.'s contradictory, sworn statement false. In any event, the disputed contact between J.G.C. and Reeves is a collateral matter which could not be a basis for impeachment. See *State v. Owens*, 257 Neb. 832, 601 N.W.2d 231 (1999). For these reasons, we conclude that the State did not engage in misconduct by permitting J.G.C. to testify that he did not have contact with Reeves.

### (iii) Alleged Juror Misconduct

In support of his motion for new trial, Van offered an affidavit of one of the jurors regarding statements he had made to other jurors during deliberation. The statements pertained to the juror's belief that sodomy was unlawful in Nebraska. The Nebraska Criminal Code, by which criminal offenses are defined in this state, does not include an offense designated as "sodomy." The district court sustained a relevancy objection to the affidavit, reasoning that while it made reference to "thoughts or comments made in the jury room," there was no evidence that the jury received any extraneous information from an external source during its deliberations. Van argues that the exclusion of the affidavit was reversible error and that the affidavit reflects juror misconduct which warrants a new trial.

In order for jury misconduct to become the basis for a new trial, it must be prejudicial. *State v. Thomas*, 262 Neb. 985, 637 N.W.2d 632 (2002); *State v. Rust*, 223 Neb. 150, 388 N.W.2d 483 (1986). Where the jury misconduct in a criminal case involves juror behavior only, the burden to establish prejudice rests on the party claiming the misconduct. *State v. Thomas, supra*; *State v. McDonald*, 230 Neb. 85, 430 N.W.2d 282 (1988).

In support of his argument that the excluded affidavit reflects juror misconduct, Van relies on *In re Stankewitz*, 40 Cal. 3d 391, 220 Cal. Rptr. 382, 708 P.2d 1260 (1985). In that case, a juror advised other jurors during guilt phase deliberations in a felony murder trial that he had been a police officer for 20 years and that robbery occurs as soon as a person forcibly takes personal property from another, regardless of intent to keep the property. This statement of the law was contrary to a jury instruction given by the court. The applicable California statute provided: " 'Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly.' " (Emphasis omitted.) 40 Cal. 3d at 397, 220 Cal. Rptr. at 384, 708 P.2d at 1262. The court reasoned that when a statement of law not given to the jury in the instructions entered the jury room, the defendant was denied his constitutional right to a fair trial unless the State could prove no actual prejudice

occurred. It thus reversed the conviction and remanded the cause for a new trial.

In the instant case, the district court relied upon the controlling statute in Nebraska, Neb. Evid. R. 606(2), Neb. Rev. Stat. § 27-606(2) (Reissue 1995), which provides:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether *extraneous prejudicial information* was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him indicating an effect of this kind be received for these purposes.

(Emphasis supplied.) In concluding that the statements which the juror claims to have made to other jurors during deliberations did not constitute "extraneous prejudicial information" within the meaning of this statute, the district court also relied upon our holding in *State v. Thomas*, 262 Neb. at 999, 637 N.W.2d at 650, that the word "extraneous" as used in this statute means " ' "existing or originating outside or beyond: external in origin: coming from the outside . . . brought in, introduced, or added from an external source or point of origin." ' " Applying this definition, we determined in *Thomas* that a juror's statement made during deliberations concerning his knowledge of another case was not extraneous because it was "provided by a member of the jury, not by an external source." 262 Neb. at 999, 637 N.W.2d at 650. We noted that "[n]one of the jurors brought extraneous information to the jury or obtained extra information about the facts of the case." *Id.* at 1000, 637 N.W.2d at 650.

We have applied the same reasoning to legal knowledge possessed by a juror. In *Leavitt v. Magid*, 257 Neb. 440, 443, 598 N.W.2d 722, 725 (1999), the unsuccessful plaintiff in a medical malpractice action alleged jury misconduct, based upon affidavits indicating that a juror, who was an attorney, "intimidated the other

jury members into using a definition of proximate cause that conflicted with the jury instructions." We concluded that the legal knowledge possessed by the attorney-juror was not extraneous prejudicial information within the meaning of § 27-602(2), because it was general knowledge not specific to the factual circumstances presented in the case. Because the juror affidavits were therefore inadmissible, we concluded that the court did not err in denying an evidentiary hearing or in denying the motion for new trial. Similarly, in *State v. Meyer*, 236 Neb. 253, 460 N.W.2d 656 (1990), we held that a juror affidavit may not be used to show a jury's misunderstanding of the law as such misunderstanding inheres in the verdict.

In this case, nothing in the excluded affidavit establishes that matters outside the personal knowledge or belief of the juror were introduced during deliberations and therefore no "extraneous" information was introduced that could be admissible under § 27-606(2). The district court did not err in excluding the affidavit, and Van did not meet his burden of proving prejudicial juror misconduct which would entitle him to a new trial.

### (iv) Newly Discovered Evidence

Van argues that the district court erred in denying his motion for new trial on grounds of newly discovered evidence. A new trial can be granted on various grounds materially affecting the substantial rights of the defendant, including "newly discovered evidence material for the defendant which he or she could not with reasonable diligence have discovered and produced at the trial." Neb. Rev. Stat. § 29-2101(5) (Cum. Supp. 2002). One moving for new trial on the basis of newly discovered evidence must show that the evidence was uncovered since the trial, that the evidence was not equally available before the trial, and that the evidence was not simply discovered by the exercise of belated diligence. *State v. Jackson*, 264 Neb. 420, 648 N.W.2d 282 (2002).

In support of his claim that he was entitled to a new trial on the basis of newly discovered evidence, Van submitted two affidavits. The first was from a private investigator who averred that he "exhausted all the available resources" he had in an attempt to locate an individual referred to as "W.B." prior to trial but was

unable to do so. The second affidavit was from W.B., who averred that in 1996, he met J.G.C. on an Internet site and that the two corresponded for 6 months. The second affidavit further states that in this correspondence, J.G.C. had expressed a desire to disappear and wanted W.B. as his master and to have complete control over him. The affidavit states that J.G.C. resided with W.B. from April 1997 until 1999. W.B. averred that J.G.C. was a "good liar" and that J.G.C. expected W.B. to provide him financial support. J.G.C. also indicated to W.B. that he wished to receive more punishment during their BDSM sessions. When the relationship ended, W.B. informed F.B. that J.G.C. was motivated only by financial gain. W.B. averred that he showed F.B. e-mail messages which J.G.C. had sent to various individuals reflecting his intention to stage his own abduction, adopt a new identity, and enter a permanent no-limits BDSM relationship. W.B. further averred that he was unaware of Van's case until after the verdict and that when he became aware of it, he contacted Van's attorney. In his affidavit, W.B. opined that J.G.C. was dishonest and motivated by his own financial interests.

When announcing its decision on the motion for new trial on the record, the district court found that the issues addressed in W.B.'s affidavit pertaining to lies by J.G.C. had been raised at trial and admitted by J.G.C. It reasoned that the defense had the opportunity to and did strongly rely on J.G.C.'s lies as a defense at trial and that the additional information provided by W.B. would have gone solely to J.G.C.'s credibility and did not therefore constitute a permissible basis for granting a new trial. See *State v. Owens*, 257 Neb. 832, 601 N.W.2d 231 (1999). The court did not make an express finding whether the "newly discovered" evidence was such that it could not have been discovered prior to trial.

We assume without deciding that Van has demonstrated that the evidence claimed as "newly discovered" was not available at trial and could not have been discovered with reasonable diligence. See *State v. Jackson, supra*. However, he was also required to demonstrate that the evidence materially affected his substantial rights. See *id*. Nothing in W.B.'s affidavit would directly affect any of J.G.C.'s testimony about what occurred between Van and him. W.B.'s testimony that J.G.C. had previously sought a no-limits BDSM relationship and that J.G.C. was capable of deception

was information that had already been presented to the jury and thus was entirely cumulative. At most, the evidence provided by W.B.'s affidavit would collaterally affect J.G.C.'s general credibility and thus was not material to Van's defense. The district court did not abuse its discretion in finding that newly discovered evidence did not support a new trial.

## III. CONCLUSION

For the reasons discussed, we find no merit in any of the assignments of error and, therefore, affirm the judgment of the district court.

AFFIRMED.