STATE OF NEBRASKA, APPELLEE, V.
EARNEST D. JACKSON, APPELLANT.

648 N.W.2d 282

Filed July 26, 2002.   Nos. S-00-1055, S-01-051.

James J. Regan for appellant.

Don Stenberg, Attorney General, and Scott G. Gunem for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

GERRARD, J.

## I. NATURE OF CASE

On August 31, 1999, Larry Perry was killed outside his home at the Redman Apartments in Omaha. Earnest D. Jackson was charged with first degree murder and use of a deadly weapon to commit a felony in connection with Perry's death. A jury found Jackson guilty of first degree murder and not guilty of use of a deadly weapon to commit a felony. Jackson appeals his conviction in case No. S-00-1055. In case

No. S-01-051, Jackson appeals the district court's refusal to grant a new trial based on newly discovered evidence. The cases were consolidated for oral argument.

## II. FACTUAL BACKGROUND

### 1. CASE No. S-00-1055

In the early evening of August 31, 1999, Robert Sommerville was riding in a gray Cadillac owned by Shawon McBride. Sommerville and McBride picked up Jackson and Dante Chillous at Chillous' home. The four men drove around without a particular destination. They ended up near the Redman Apartments, where they conversed in the parking lot with a group of people. Sommerville testified that they saw and spoke with Shalamar Cooperrider, then followed Cooperrider to his aunt's house, where Chillous and Jackson got out of the car. At some point, McBride picked up Cooperrider and Jackson at Jackson's house and dropped them off at an alley a block south of Redman Avenue.

Perry shared an apartment at 4614 Redman Avenue with his mother, Margaret Parrott, and his sister Elizabeth Williams. On the evening of August 31, 1999, Parrott and Perry were outside the apartment. Parrott went inside at 11:30 p.m., but Perry stayed outside with Elexsis Fulton.

While Perry was outside with Fulton on August 31, 1999, Cooperrider approached Perry and the two began talking. Fulton, who had not seen Cooperrider before, described him as "light brown" with a brush haircut, wearing a tan shirt and tan pants. During the conversation, two more men, whom Fulton described, respectively, as light-skinned with a ponytail and dark-skinned with braided hair and a blue "FUBU" brand shirt, came out of the apartment building one door north of Perry's door. At trial, Fulton identified the ponytailed man as Chillous and the man with braids and a FUBU shirt as Jackson. The jury received other testimony that Jackson did not have his hair in braids, but that Chillous wore his hair in a ponytail. Fulton observed Jackson, Cooperrider, and Chillous leave the Redman Apartments in a gray Cadillac after Cooperrider's conversation with Perry.

After the Cadillac departed, Perry entered his apartment and retrieved a .22-caliber Ruger handgun. Parrott and Williams

followed Perry out of the apartment, and Parrott observed Perry for some reason bending down beside a bush by 4612 Redman Avenue, the apartment building opposite 4614 Redman Avenue. Parrott reentered the apartment.

Fulton testified that later, the gray Cadillac returned and that Jackson, Cooperrider, and Chillous got out of the Cadillac. Fulton stated that Cooperrider had changed from tan clothing to black clothing. Fulton observed the three men approach Perry, and Cooperrider and Perry began arguing. Chillous and Jackson went across the street to Chillous' home, and on their way back, Fulton saw Chillous try to hand Cooperrider a gun. Fulton testified that Jackson got involved in the argument, then pulled out a gun and struck Perry in the head three times. Fulton then ran inside the building and continued to watch from an upstairs window. Fulton testified that Chillous was the first to fire a gun and that he saw Perry being shot in the back while he lay on his stomach.

Fulton testified at Jackson's trial that he had no doubt that Jackson shot Perry. Fulton had not known the names of Jackson, Chillous, or Cooperrider before bystanders (who had not witnessed the shooting) told Fulton the names of the three men. Jackson's counsel read into evidence Fulton's testimony from the preliminary hearing that Fulton had learned Jackson's, Cooperrider's, and Chillous' names from the police. Fulton testified that he had identified Jackson, Cooperrider, and Chillous at the preliminary hearing as the men who shot Perry. Fulton had not previously identified Jackson in a photographic or police lineup.

Parrott heard 20 to 30 shots that sounded as if they were coming from different types of guns at different distances; Williams testified that the sound resembled firecrackers. Parrott and Williams ran outside after hearing gunshots and found Perry on the sidewalk with bullet wounds in his stomach. Parrott removed the gun from Perry's belt and gave it to Williams, telling her to get rid of it. Parrott testified that when she removed Perry's gun by the handle, it was not warm.

Williams testified to seeing a man, dressed in black with dark skin and a brush haircut, fleeing the scene after Perry's shooting, but she did not know and could not identify Jackson. McBride also testified that he saw a man in black firing a gun, standing by the bushes located near 4612 Redman Avenue. Although

McBride did not see the shooter's face, he stated that the shooter wore the same kind of clothing Cooperrider had been wearing. McBride confirmed that he had seen Jackson with Cooperrider shortly before the shooting.

Jackson's aunt testified that at 11:19 p.m. on August 31, 1999, Jackson knocked on her door, entered her home, talked with her, and went into her basement around 11:30 p.m. to play a video game. Approximately 20 minutes later, Jackson's cousin knocked on the aunt's bedroom door to get the cordless telephone and asked her if she had heard gunshots. She had not. Jackson's aunt and cousin testified that Jackson had stayed at the aunt's home that night.

Officer Harold Scott of the Omaha Police Department arrived at the scene of the shooting at approximately 12:30 a.m. and discovered Perry's body on the sidewalk in front of 4614 Redman Avenue, surrounded by a crowd of people. Omaha police officer Stefan Davis, upon nearing the scene of the murder, was notified of people who had fled the area. Later, Davis received notification that all suspects were in custody. Jackson, however, was not arrested until October 9, 1999.

Dr. Jerry Jones, who performed the autopsy on Perry's body, determined that Perry died of the multiple gunshot wounds that perforated his heart, both lungs, liver, spleen, colon, and kidney. Jones testified that he had examined Perry's body thoroughly and that he did not see abrasions on Perry's head or scalp.

Identical informations were filed against Jackson, Cooperrider, and Chillous in Douglas County District Court, charging each of them with first degree murder and use of a deadly weapon during the commission of a felony in the death of Perry. The cases were consolidated for trial on the State's motion, but the district court subsequently vacated this order on the State's motion. Jackson's trial, having the lowest docket number, began first, followed by Cooperrider's and Chillous' trials.

A jury found Jackson guilty of first degree murder and not guilty of use of a deadly weapon to commit a felony. Jackson filed a motion for new trial, claiming that Fulton's testimony regarding Cooperrider and Chillous did not have proper foundation, that the jury's verdict was inconsistent and self-contradictory, that the court addressed the jury outside the parties' presence after the jury

retired for deliberations, and that there was insufficient evidence to sustain a conviction of first degree murder. The district court overruled Jackson's motion and sentenced him to life imprisonment. Further facts surrounding Perry's shooting are set forth below as necessary.

## 2. CASE No. S-01-051

Following his conviction and sentencing, Jackson filed a motion for new trial based on newly discovered evidence, i.e., testimony given at Cooperrider's and Chillous' trials. Cooperrider testified at his own trial that he did not see Jackson at the scene of Perry's shooting and that Jackson was not one of the people who shot Perry. Instead, Cooperrider testified that Sommerville and one of Sommerville's friends were present at Perry's shooting. Cooperrider testified that Sommerville wore his hair in braids at the time of Perry's death, in a hairstyle similar to Jackson's. At Chillous' trial, Cooperrider again testified that Sommerville and a friend of Sommerville's were present at the scene of Perry's shooting, but he did not see Jackson or anyone else at the scene. Juries acquitted both Cooperrider and Chillous.

Stephen Kraft, Cooperrider's attorney, submitted an affidavit stating that prior to Jackson's trial, Jackson's counsel contacted Kraft to inform Kraft of his intent to subpoena Cooperrider as a witness on Jackson's behalf for Jackson's trial. Kraft informed Jackson's counsel that because Cooperrider was awaiting trial on identical charges in the same matter, he would not be willing to testify and would invoke his Fifth Amendment right against self-incrimination and refuse to testify if called. Jackson served Kraft with a subpoena directing Cooperrider's presence as a witness at Jackson's trial, but Kraft again advised Jackson's counsel that Cooperrider would, if called, invoke his right against self-incrimination.

Jackson filed a motion for new trial, alleging that Cooperrider's testimony from Cooperrider's and Chillous' trials provided new evidence that would have changed the jury's verdict in Jackson's trial. The district court overruled Jackson's motion for new trial, finding that Cooperrider's testimony was not newly discovered, but only newly available—Cooperrider merely controlled the dissemination of his testimony for tactical

reasons. In its order, the district court referred to telephone conversations in which Cooperrider discussed coordinating his testimony with Chillous and other witnesses testifying at Chillous' trial. The district court concluded that even if Cooperrider's testimony had been presented at Jackson's trial, the jury still heard enough evidence to convict Jackson.

Pursuant to Neb. Rev. Stat. § 24-1106(1) (Reissue 1995), we acquired jurisdiction over this appeal because of Jackson's sentence to life imprisonment. Cases Nos. S-00-1055 and S-01-051 were consolidated for oral argument.

## III. ASSIGNMENTS OF ERROR

Jackson assigns, restated, that the district court erred in (1) allowing Fulton to testify using the names of Cooperrider and Chillous, as there was insufficient foundation for such testimony; (2) failing to notify Jackson's counsel before responding to questions the jury presented during its deliberation; (3) refusing to grant Jackson a new trial because the jury's verdicts of guilty of first degree murder but not guilty of using a deadly weapon during the commission of a felony were inconsistent, incongruous, and irreconcilable; (4) determining that sufficient evidence was adduced at trial to sustain a conviction for first degree murder; and (5) refusing to grant Jackson a new trial based upon (a) a determination that the testimony of Cooperrider was not newly discovered for the purposes of Neb. Rev. Stat. § 29-2101 (Reissue 1995), (b) a determination that if a jury heard the testimony of Cooperrider in addition to evidence already offered, it would not reach a different verdict, and (c) facts not properly before the court concerning conversations between Chillous and Cooperrider characterized by the court as an agreement to coordinate Cooperrider's testimony with other witnesses called at Chillous' trial.

## IV. STANDARD OF REVIEW

In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. Such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the properly admitted evidence,

viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Long, ante* p. 85, 645 N.W.2d 553 (2002).

When reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Canaday*, 263 Neb. 566, 641 N.W.2d 13 (2002).

In a criminal case, a motion for new trial is addressed to the discretion of the trial court, and unless an abuse of discretion is shown, the trial court's determination will not be disturbed. *State v. Bao*, 263 Neb. 439, 640 N.W.2d 405 (2002).

## V. ANALYSIS

### 1. Case No. S-00-1055: Jackson's Trial

#### (a) Foundation for Fulton's Testimony

Jackson assigns, first, that the district court erred in overruling his objections at trial to Fulton's use of the names "Shalamar" and "Dante" in his testimony, because the State did not provide a sufficient foundation for the use of the names. Jackson argues that allowing Fulton to refer to "Shalamar" and "Dante" by name tied together the State's theory of the case that Cooperrider, Chillous, and Jackson acted together to kill Perry. Fulton used these names to identify people present on the night of the shooting, although he testified that he had never met "Shalamar" or "Dante." Fulton stated that he only knew the names "Shalamar" and "Dante" because he had heard them from the police and bystanders at the apartment complex.

Jackson alleges that, pursuant to Neb. Rev. Stat. §§ 27-104 and 27-602 (Reissue 1995), Fulton did not possess the foundational personal knowledge necessary to testify regarding the names of "Shalamar" and "Dante." Section 27-602 states, in pertinent part, that a witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the testimony

of the witness himself. *Id.* Section 27-104(1) states, in pertinent part, that preliminary questions concerning the qualification of a person to be a witness, or the admissibility of evidence, shall be determined by the trial judge. A witness testifying to objective facts must have had means of knowing the facts from the witness' personal knowledge. See *State v. Kirksey*, 254 Neb. 162, 575 N.W.2d 377 (1998). An appellate court reviews the trial court's conclusions with regard to evidentiary foundation and witness qualification for an abuse of discretion. See *State v. Irish*, 223 Neb. 578, 584, 391 N.W.2d 137, 141 (1986) ("[t]he admission or exclusion of evidence is a matter left largely to the sound discretion of the trial court, whose ruling will be upheld absent an abuse of discretion").

In this case, Fulton saw Cooperrider, Chillous, and Jackson at the scene of Perry's shooting, although he did not know their names. By the time of the preliminary hearing, Fulton had learned the names of the three men from the police and from bystanders who knew the three men. Fulton testified that seeing Cooperrider, Chillous, and Jackson at the preliminary hearing allowed him to link the names with the faces that he recognized from the night of Perry's shooting. In other words, while Fulton later learned Cooperrider's, Chillous', and Jackson's names, that did not affect his testimony, as an eyewitness, that they were present at the scene of the shooting.

A judicial abuse of discretion exists only when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result in matters submitted for disposition. *State v. Dean, ante* p. 42, 645 N.W.2d 528 (2002). The facts above demonstrate that the district court had a tenable basis upon which to allow Fulton's testimony to go to the jury. Thus, the district court did not abuse its discretion in overruling Jackson's objection. This assignment of error is without merit.

### (b) Sufficiency of Evidence

Jackson argues that the evidence adduced at trial was not sufficient to support a conviction of first degree murder. Jackson bases this argument on the allegedly erroneous admission of Fulton's testimony, but Jackson argues in the alternative that the

evidence is insufficient to support Jackson's conviction even with Fulton's testimony.

In support of his argument, Jackson notes that forensic evidence of bullet casing locations was presented to demonstrate that Perry was shot many times from a variety of angles, which conflicts with Fulton's testimony that Perry was shot by three people standing over Perry, 3 feet away. Further, Jackson asserts that the autopsy did not reveal bruising or abrasion to Perry's head, in contradiction of Fulton's testimony that Jackson struck Perry on the head with a gun three times with enough strength to cause a bruise. Additionally, Jackson argues that Fulton changed his testimony from the preliminary hearing, had never identified Jackson prior to appearing in court, had never seen any of the parties about whom he was testifying, and had learned the parties' names from the police and bystanders who did not see the shooting.

Fulton, however, testified that he had no doubt that Jackson was the person that he saw shoot Perry. Further, a firearms expert testified that bullet casing locations cannot be used to conclusively establish the location of a firearm's discharge. Finally, although Jones testified that there were no abrasions to Perry's head or scalp, the autopsy photographs reveal an abrasion beneath Perry's left eye.

In essence, Jackson's assignment of error attacks the credibility of the witnesses. Witness credibility, however, is not to be reassessed on appellate review. See *State v. McLemore*, 261 Neb. 452, 623 N.W.2d 315 (2001). When reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Canaday*, 263 Neb. 566, 641 N.W.2d 13 (2002). Here, relevant and sufficient evidence exists to support Jackson's conviction, and this assignment of error is without merit.

(c) Instructing Jury Outside Counsel and Parties' Presence

Jackson assigns that the district court erred in refusing to grant him a new trial because the court instructed the jury outside the

presence of the parties and counsel when the jury, after retiring, submitted three requests for clarification or additional instructions to the court. The State argues that the record does not establish that the court failed to notify the parties and their counsel and that even if the allegation is supported by the record, the communications did not result in prejudice to Jackson.

The first communication stated: "After debilerating (sic) Monday, juror went home and put on paper her points she would like to make during deliberations on Tuesday. Can a juror refer to her notes that were made at home?" The court responded, "As long as the notes are based upon the evidence that was adduced at trial, those notes can be used by a juror." In the same communication, the jury asked, "Is reasonable doubt 70% 30%?" The court responded, "I am not permitted to expand upon the instructions that you have already been given. Please refer to your instructions, including the definition of 'reasonable doubt' which appears at Instruction No. 9."

The second communication stated: "Juror instruction sheet states use of a firearm to commit a felony. The verdict sheet states use of a weapon . . . which are we to use in our decision — weapon or firearm?" The court responded, "The terms are interchangeable." The third communication read: "May the jury replace its foreperson?" to which the court responded, "Yes."

Jackson claims that the court should not have addressed the jury outside the presence of the parties, pursuant to Neb. Rev. Stat. § 25-1116 (Reissue 1995). Section 25-1116 states:

> After the jury have retired for deliberation, if there be a disagreement between them as to any part of the testimony, or if they desire to be informed as to any part of the law arising in the case, they may request the officer to conduct them to the court where the information upon the point of law shall be given, and the court may give its recollection as to the testimony on the point in dispute in the presence of or after notice to the parties or their counsel.

If it becomes necessary to give further instructions to the jury during deliberation, the proper practice is to call the jury into open court and to give any additional instructions in writing in the presence of the parties or their counsel. See *State v. Owen*, 1 Neb. App. 1060, 510 N.W.2d 503 (1993), citing

*Nebraska Depository Inst. Guar. Corp. v. Stastny*, 243 Neb. 36, 497 N.W.2d 657 (1993). The State has the burden to prove that a defendant was not prejudiced by any improper communication between the judge and the jury. *State v. Thomas*, 262 Neb. 985, 637 N.W.2d 632 (2002). If the record affirmatively shows that the defendant has been prejudiced by private communication between the trial court and jurors, it is reversible error, and a new trial should be granted. Reversal is not required if the record affirmatively shows that the communication had no tendency to influence the verdict. See *id.*

Although communication between the trial judge and jurors should always take place with the parties and their counsel present (unless waived), the record before us does not affirmatively show that the communications in this case resulted in prejudice. The communication regarding the jury foreperson did not relate to the evidence or the law and, thus, does not implicate § 25-1116. The court should have dealt with the other three questions after notice to the parties. The court's responses, however, were legally correct answers to which Jackson, if present, could have raised no valid complaint. Any issue of juror misconduct implied by the jury's questions was waived by Jackson's failure to object on that basis or specifically raise the issue at the hearing on his motion for new trial. The district court did not abuse its discretion in refusing to grant a new trial on the basis of the communications between the jury and the judge.

### (d) Contradictory and Inconsistent Verdict

Jackson assigns that the district court erred in refusing to grant him a new trial because the verdicts of guilty of murder in the first degree, but not guilty of use of a deadly weapon to commit a felony, are contradictory. Jackson argues that if the jury found Jackson guilty of murdering Perry, who died from gunshot wounds, but not guilty of using a deadly weapon to commit the murder, such a verdict is illogical and inconsistent. Jackson's argument, however, is without merit.

The court's instructions to the jury included instruction No. 10, which stated:

> A Defendant can be guilty of a crime even though he personally did not commit every act involved in the crime so

long as he aided someone else to commit it. A Defendant aided someone else if:

(1) He encouraged or intentionally helped another person to commit the crime; and

(2) The Defendant knew that the other person intended to commit the crime; and

(3) The crime in fact was committed by that other person.

Pursuant to this instruction, which accurately states the law and to which Jackson did not object, the jury could feasibly find Jackson guilty of first degree murder without finding that Jackson used a deadly weapon to do so. The verdicts reached by the jury are not necessarily inconsistent—the above instruction reveals that there was a logical and consistent manner in which the jury could have reached its verdict. Based on the evidence presented, the jury could have concluded that Jackson aided in the murder of Perry and was thus guilty of murder under instruction No. 10, but did not personally fire a deadly weapon. Thus, we conclude that the district court did not abuse its discretion in refusing to grant Jackson a new trial on this ground.

2. CASE NO. S-01-051: NEWLY DISCOVERED EVIDENCE

Jackson assigns that the district court erred in failing to grant him a new trial based on the alleged newly discovered evidence provided by Cooperrider at Cooperrider's and Chillous' subsequent trials. Section 29-2101 stated, in pertinent part:

A new trial, after a verdict of conviction, may be granted, on the application of the defendant, for any of the following reasons affecting materially his substantial rights: . . . (5) newly discovered evidence material for the defendant which he could not with reasonable diligence have discovered and produced at the trial.

Cooperrider testified at his trial and at Chillous' trial that Jackson was not present at Perry's shooting.

One moving for new trial on the basis of newly discovered evidence must show that the evidence was uncovered since the trial, that the evidence was not equally available before the trial, and that the evidence was not simply discovered by the exercise of belated diligence. *State v. Hirsch*, 245 Neb. 31, 511 N.W.2d 69 (1994). Generally, newly discovered

evidence is evidence material to the defense that could not with reasonable diligence have been discovered and produced in the prior proceedings. *State v. Ryan*, 257 Neb. 635, 601 N.W.2d 473 (1999); *Hirsch, supra.*

Jackson argues that because Cooperrider indicated a refusal to testify, if called as a witness, Cooperrider's testimony was not available to Jackson at the time of Jackson's trial. Jackson further asserts that the import of Cooperrider's testimony would likely have changed the outcome of Jackson's trial. Cooperrider's status as a codefendant of Jackson's, however, raises a novel legal question before this court.

■ We have not addressed whether testimony of a codefendant who offers testimony at a subsequent trial, after refusing to testify at a defendant's previous trial, constitutes newly discovered evidence requiring a new trial for the defendant. We now determine that when a codefendant, such as Cooperrider, who has chosen not to testify subsequently comes forward to offer testimony exculpating a defendant, such as Jackson, the evidence is not newly discovered. See *U.S. v. Moore*, 221 F.3d 1056 (8th Cir. 2000). This is because the codefendant's testimony is not newly discovered evidence, but only newly *available* evidence which does not provide a basis for the granting of a new trial.

The clear policy behind concluding that newly available evidence, such as Cooperrider's testimony, does not constitute newly discovered evidence is that

> [i]t would encourage perjury to allow a new trial once co-defendants have determined that testifying is no longer harmful to themselves. They may say whatever they think might help their co-defendant, even to the point of pinning all the guilt on themselves, knowing they are safe from retrial. Such testimony would be untrustworthy and should not be encouraged.

*U.S. v. Reyes-Alvarado*, 963 F.2d 1184, 1188 (9th Cir. 1992).

Further, Jackson failed to demonstrate that he was not aware of Cooperrider's testimony prior to trial such that it would be newly discovered evidence. The fact that Jackson attempted to secure Cooperrider's testimony reveals that Jackson knew that Cooperrider's testimony could have been beneficial to his case—even though Jackson filed no formal motion to compel

Cooperrider's testimony and force him to invoke the Fifth Amendment. The substance of the codefendant's testimony is not, in fact, new evidence if it was always known by the defendant seeking a new trial. See *State v. Jackson*, 188 Wis. 2d 187, 525 N.W.2d 739 (Wis. App. 1994). We, therefore, conclude that the district court did not err in determining that Cooperrider's testimony does not constitute newly discovered evidence for the purposes of Jackson's motion for new trial.

We note that our conclusion is consistent with the many state and federal jurisdictions which have determined that the requirement that evidence be discovered since trial is not met by offering the posttrial testimony of a coconspirator or codefendant who refused to testify at trial. See, e.g., *U.S. v. Freeman*, 77 F.3d 812 (5th Cir. 1996); *U.S. v. Theodosopoulos*, 48 F.3d 1438 (7th Cir. 1995); *U.S. v. Muldrow*, 19 F.3d 1332 (10th Cir. 1994); *U.S. v. Dale*, 991 F.2d 819 (D.C. Cir. 1993); *Reyes-Alvarado, supra*; *State v. Bright*, 776 So. 2d 1134 (La. 2000); *State v. Warren*, 592 N.W.2d 440 (Minn. 1999); *State v. Redford*, 248 Kan. 130, 804 P.2d 983 (1991); *Yarbrough v. State*, 57 S.W.3d 611 (Tex. App. 2001); *State v. Dunlap*, 187 Ariz. 441, 930 P.2d 518 (Ariz. App. 1996); *Jackson, supra*. But see, *U.S. v. Montilla-Rivera*, 115 F.3d 1060 (1st Cir. 1997); *Totta v. State*, 740 So. 2d 57 (Fla. App. 1999).

■ Jackson did not argue, and we will not consider, the assignment that the district court erred in relying upon facts not properly before the court concerning telephone conversations between Chillous and Cooperrider. Errors that are assigned but not argued will not be addressed by an appellate court. *State v. Siddens*, 263 Neb. 751, 642 N.W.2d 791 (2002).

Cooperrider's testimony does not constitute newly discovered evidence that would warrant granting Jackson a new trial. We conclude, therefore, that the district court did not abuse its discretion in refusing to grant Jackson a new trial.

## VI. CONCLUSION

For the reasons set forth above, Jackson's assignments of error are without merit. We, therefore, affirm the district court judgments in cases Nos. S-00-1055 and S-01-051.

AFFIRMED.