Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
09/15/2017 09:11 AM CDT

STATE OF NEBRASKA, APPELLEE, V.
EARNEST D. JACKSON, APPELLANT.
___ N.W.2d ___

Filed June 23, 2017.    No. S-16-506.

1. **Sentences: Appeal and Error.** An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court.
2. **Judges: Words and Phrases.** A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.
3. **Constitutional Law: States: Minors: Convictions: Sentences: Probation and Parole.** It is unconstitutional for a state to impose a sentence of life imprisonment without parole on a juvenile convicted of a nonhomicide offense.
4. **Minors: Convictions.** Juvenile offenders convicted of nonhomicide crimes must be given some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.
5. **Minors: Convictions: Homicide: Sentences.** In *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012), the U.S. Supreme Court declined to extend a categorical bar of no life-without-parole sentences to juveniles convicted of homicide.
6. **Minors: Sentences.** A sentencer must take into account how children are different and how those differences counsel against irrevocably sentencing them to a lifetime in prison.
7. **Constitutional Law: States: Courts: Time: Appeal and Error.** When a new substantive rule of constitutional law controls the outcome of a case, the federal Constitution requires state collateral review courts to give retroactive effect to that rule.
8. **Minors: Convictions: Homicide: Sentences.** A juvenile offender convicted of a homicide offense may be sentenced to life imprisonment without parole so long as the sentencer considered specific, individualized factors before handing down that sentence.

9. **Sentences: Judgments.** The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observations of the defendant's demeanor and attitude and all of the facts and circumstances surrounding the defendant's life.

Appeal from the District Court for Douglas County: J RUSSELL DERR, Judge. Affirmed.

Jeffery A. Pickens, of Nebraska Commission on Public Advocacy, for appellant.

Douglas J. Peterson, Attorney General, and Melissa R. Vincent for appellee.

HEAVICAN, C.J., WRIGHT, MILLER-LERMAN, CASSEL, STACY, KELCH, and FUNKE, JJ.

FUNKE, J.

## NATURE OF CASE

In 2000, a jury found Earnest D. Jackson guilty of first degree murder but acquitted him of the use of a deadly weapon charge. The court sentenced him to life imprisonment for the first degree murder conviction. On direct appeal, we affirmed Jackson's conviction and sentence.[1]

This is Jackson's appeal from the district court's order resentencing him for his first degree murder conviction. At the time of the crime, Jackson's age was 17 years 10 months. The resentencing was required under the U.S. Supreme Court's decisions in *Miller v. Alabama*[2] and *Montgomery v. Louisiana*[3] and this court's decision in *State v. Mantich*.[4] Following a full evidentiary hearing and arguments, Jackson was resentenced

---

[1] *State v. Jackson*, 264 Neb. 420, 648 N.W.2d 282 (2002).

[2] *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012).

[3] *Montgomery v. Louisiana*, ___ U.S. ___, 136 S. Ct. 718, 193 L. Ed. 2d 599 (2016).

[4] *State v. Mantich*, 287 Neb. 320, 842 N.W.2d 716 (2014).

in accordance with Nebraska statutes. Jackson appeals his resentencing. We affirm.

## FACTS

### FACTS OF CRIME AND DIRECT APPEAL

In Jackson's direct appeal, we set forth the facts upon which his conviction was supported. On August 31, 1999, Robert Sommerville, Shawon McBride, Dante Chillous, and Jackson were riding in a gray Cadillac, without a particular destination. They ended up near the Redman Apartments, where they conversed in the parking lot with a group of people. Sommerville testified that they spoke with Shalamar Cooperrider, then followed Cooperrider to his aunt's house, where Chillous and Jackson got out of the car. At some point, McBride picked up Cooperrider and Jackson at Jackson's house and dropped them off at an alley a block south of Redman Avenue.

Lance Perry resided in an apartment located at 4614 Redman Avenue with his mother, Margaret Parrott, and his sister Elizabeth Williams. On the evening of August 31, 1999, Parrott and Perry were outside the apartment until Parrott went inside at 11:30 p.m. Perry stayed outside with Elexsis Fulton.

While Perry and Fulton were still outside, Cooperrider approached Perry and the two began talking. Fulton, who had never met Cooperrider before that night, described him as "light brown" with a brush haircut, wearing a tan shirt and tan pants. During the conversation, two more men, whom Fulton described, respectively, as light-skinned with a ponytail and dark-skinned with braided hair and a blue "FUBU" brand shirt, came out of the apartment building one door north of Perry's door. At trial, Fulton identified the ponytailed man as Chillous and the man with braids and a FUBU shirt as Jackson. The jury received other testimony that Jackson did not have his hair in braids, but that Chillous wore his hair in a ponytail. Fulton observed Jackson, Cooperrider, and Chillous leave the Redman Apartments in a gray Cadillac after Cooperrider's conversation with Perry.

After the Cadillac departed, Perry entered his apartment and retrieved a .22-caliber Ruger handgun. Parrott and Williams followed Perry out of the apartment, and Parrott observed Perry bending down beside a bush by 4612 Redman Avenue, the apartment building opposite 4614 Redman Avenue. Parrott reentered the apartment.

Fulton testified that the gray Cadillac returned later that evening and that Jackson, Cooperrider, and Chillous got out of the Cadillac. Fulton further testified that Cooperrider had changed from tan clothing to black clothing. Fulton observed the three men approach Perry, at which time, Cooperrider and Perry began arguing. Chillous and Jackson went across the street to Chillous' home, and on their way back, Fulton saw Chillous try to hand Cooperrider a gun. Fulton testified that Jackson got involved in the argument, then pulled out a gun and struck Perry in the head three times. Fulton then ran inside the building and continued to watch from an upstairs window. Fulton testified that Chillous was the first to fire a gun and that he saw Perry being shot in the back while lying on his stomach.

Fulton testified at Jackson's trial that he had no doubt that Jackson shot Perry. Fulton had not known the names of Jackson, Chillous, or Cooperrider before bystanders (who had not witnessed the shooting) told Fulton the names of the three men. Jackson's counsel read into evidence Fulton's testimony from the preliminary hearing that Fulton had learned Jackson's, Cooperrider's, and Chillous' names from the police. Fulton testified that he had identified Jackson, Cooperrider, and Chillous at the preliminary hearing as the men who shot Perry. Fulton had not previously identified Jackson in a photographic or police lineup.

Parrott heard 20 to 30 shots that sounded as if they were coming from different types of guns at different distances; Williams testified that the sound resembled firecrackers. Parrott and Williams ran outside after hearing gunshots and found Perry on the sidewalk with bullet wounds in his stomach. Parrott

removed a gun from Perry's belt and gave it to Williams, telling her to get rid of it. Parrott testified that when she removed Perry's gun by the handle, it was not warm.

Williams testified to seeing a man, dressed in black with dark skin and a brush haircut, fleeing the scene after Perry's shooting, but she did not know and could not identify Jackson. McBride also testified that he saw a man in black firing a gun, standing by the bushes located near 4612 Redman Avenue. Although McBride did not see the shooter's face, he stated that the shooter wore the same kind of clothing Cooperrider had been wearing. McBride confirmed that he had seen Jackson with Cooperrider shortly before the shooting.

Jackson's aunt testified that at 11:19 p.m. on August 31, 1999, Jackson knocked on her door, entered her home, talked with her, and went into her basement around 11:30 p.m. to play a video game. Approximately 20 minutes later, Jackson's cousin knocked on the aunt's bedroom door to get the cordless telephone and asked her if she had heard gunshots. She had not. Jackson's aunt and cousin testified that Jackson had stayed at the aunt's home that night.

Officer Harold Scott of the Omaha Police Department arrived at the scene of the shooting at approximately 12:30 a.m. and discovered Perry's body on the sidewalk in front of 4614 Redman Avenue, surrounded by a crowd of people. Omaha police officer Stefan Davis, upon nearing the scene of the murder, was notified of people who had fled the area. Later, Davis received notification that all suspects were in custody. Jackson, however, was not arrested until October 9, 1999.

Dr. Jerry Jones, who performed the autopsy, determined that Perry died of multiple gunshot wounds that perforated his heart, both lungs, liver, spleen, colon, and kidney. Jones testified that he had examined Perry's body thoroughly and that he did not see abrasions on Perry's head or scalp.

Identical informations were filed against Jackson, Cooperrider, and Chillous in Douglas County District Court, charging each of them with first degree murder and use of

a deadly weapon during the commission of a felony in the death of Perry. The cases were consolidated for trial on the State's motion, but the district court subsequently vacated this order on the State's motion. Jackson's trial, having the lowest docket number, began first, followed by Cooperrider's and Chillous' trials.

The jury found Jackson guilty of first degree murder, but acquitted him of using a deadly weapon to commit a felony. Jackson then filed a motion for new trial, claiming that Fulton's testimony regarding Cooperrider and Chillous did not have proper foundation, that the jury's verdict was inconsistent and self-contradictory, that the court addressed the jury outside the parties' presence after the jury retired for deliberations, and that there was insufficient evidence to sustain a conviction of first degree murder. The district court overruled Jackson's motion and sentenced him to life imprisonment. Further facts surrounding Perry's shooting are set forth below as necessary.

At Cooperrider's own trial, he testified that he was present at the scene, that he fired his handgun several times in self-defense, and that he did not see Jackson at the scene. Cooperrider also testified that Jackson was not one of the people who shot Perry. Instead, Cooperrider testified that Sommerville and one of Sommerville's friends were present at Perry's shooting. Cooperrider testified that Sommerville wore his hair in braids at the time of Perry's death, in a hairstyle similar to Jackson's. At Chillous' trial, Cooperrider again testified that Sommerville and a friend of Sommerville's were present at the scene of Perry's shooting, but he did not see Jackson or anyone else at the scene. Juries acquitted both Cooperrider and Chillous.

Stephen Kraft, Cooperrider's attorney, submitted an affidavit stating that prior to Jackson's trial, Jackson's counsel contacted Kraft to inform Kraft of his intent to subpoena Cooperrider as a witness on Jackson's behalf for Jackson's trial. Kraft informed Jackson's counsel that because Cooperrider

was awaiting trial on identical charges in the same matter, he would not be willing to testify and would invoke his Fifth Amendment right against self-incrimination and refuse to testify if called. Jackson served Kraft with a subpoena directing Cooperrider's presence as a witness at Jackson's trial, but Kraft again advised Jackson's counsel that Cooperrider would, if called, invoke his right against self-incrimination.

Jackson filed a second motion for new trial, alleging that Cooperrider's testimony from Cooperrider's and Chillous' trials provided new evidence that would have changed the jury's verdict in Jackson's trial. The district court overruled Jackson's motion for new trial, finding that Cooperrider's testimony was not newly discovered, but only newly available—Cooperrider merely controlled the dissemination of his testimony for tactical reasons. In its order, the district court referred to telephone conversations in which Cooperrider discussed coordinating his testimony with Chillous and other witnesses testifying at Chillous' trial. The district court concluded that even if Cooperrider's testimony had been presented at Jackson's trial, the jury still heard sufficient evidence to convict Jackson.

In Jackson's direct appeal, this court rejected his argument that the jury's verdicts were contradictory and inconsistent. We concluded that under the aiding and abetting instruction, which accurately stated the law and to which Jackson did not object, the jury could find that Jackson was guilty of first degree murder while also finding that he "did not personally fire a deadly weapon."[5] We also rejected his argument that the evidence was insufficient to support his conviction. Jackson contended that because investigators had found bullet casings from locations that showed Perry was shot from multiple angles and because the autopsy showed no bruising or abrasion on Perry's head, Fulton's account of the crime was not accurate and Fulton had changed his testimony. However, we characterized his

---

[5] *Jackson, supra* note 1, 264 Neb. at 432, 648 N.W.2d at 292.

argument as attacking the witnesses' credibility and rejected it. We recited evidence that the location of bullet casings could not conclusively prove a gun had been fired from that same location, that Perry did have an abrasion under his left eye, and that Fulton was sure Jackson had shot Perry.

Finally, we concluded that Cooperrider's subsequent exculpatory testimony was not newly discovered evidence. Instead, it was newly available evidence that did not provide a basis for a new trial. We agreed with the Ninth Circuit that allowing a new trial so a codefendant could testify after the government could no longer retry the codefendant would encourage perjury.[6] We also reasoned that Jackson knew Cooperrider's testimony would have been beneficial to him or he would not have attempted to secure it. We cited many cases in which courts have held that the posttrial testimony of a codefendant or coconspirator who refused to testify at the defendant's trial is not newly discovered evidence.[7]

## POSTCONVICTION AND RESENTENCING

In Jackson's operative postconviction motion, he sought an order vacating the judgment of conviction and sentencing, because the orders were void or voidable under the U.S. and Nebraska Constitutions. He alleged that his trial attorney was ineffective for several reasons, including his failure to object to arguments or evidence about gang affiliations and activities.

---

[6] *Jackson, supra* note 1, citing *U.S. v. Reyes-Alvarado*, 963 F.2d 1184 (9th Cir. 1992).

[7] *Id.*, citing *U.S. v. Freeman*, 77 F.3d 812 (5th Cir. 1996); *U.S. v. Theodosopoulos*, 48 F.3d 1438 (7th Cir. 1995); *U.S. v. Muldrow*, 19 F.3d 1332 (10th Cir. 1994); *U.S. v. Dale*, 991 F.2d 819 (D.C. Cir. 1993); *Reyes-Alvarado, supra* note 6; *State v. Bright*, 776 So. 2d 1134 (La. 2000); *State v. Warren*, 592 N.W.2d 440 (Minn. 1999); *State v. Redford*, 248 Kan. 130, 804 P.2d 983 (1991); *Yarbrough v. State*, 57 S.W.3d 611 (Tex. App. 2001); *State v. Dunlap*, 187 Ariz. 441, 930 P.2d 518 (Ariz. App. 1996); *State v. Jackson*, 188 Wis. 2d 187, 525 N.W.2d 739 (Wis. App. 1994). But see, *U.S. v. Montilla-Rivera*, 115 F.3d 1060 (1st Cir. 1997); *Totta v. State*, 740 So. 2d 57 (Fla. App. 1999).

But Jackson's primary argument was that he was effectively sentenced to life without parole for a crime that occurred when he was 17 years old and that this sentence was prohibited by the Eighth Amendment to the U.S. Constitution and Neb. Const. art. I, § 9.

In August 2015, the district court overruled all of Jackson's claims except his request for relief under *Miller*[8] and *Mantich*.[9] At the postconviction hearing, the court received evidence that Jackson was born in October 1981; thus, he was age 17 years 10 months when Perry was killed on August 31, 1999. In October 2015, the court issued an order vacating Jackson's life sentence and scheduled a new sentencing hearing for January 2016.

At the January mitigation hearing, Jackson presented the testimony of Kayla Pope, who is an attorney, a board-certified child and adolescent psychiatrist, and an expert in adolescent brain development. A deposition Pope gave in *State v. Smith*, Washington County District Court, No. CRl3-9000001, was also received at Jackson's mitigation hearing.

Pope testified that she was the director for neurobehavioral research at Boys Town National Research Hospital and the program director for the general psychiatric training program at Creighton Medical Center and the University of Nebraska Medical Center.

Though she had not met with Jackson, Pope testified generally about brain development and how researchers had learned that the brain develops over time, with the last part of the brain to develop being the frontal cortex. She said that the prefrontal cortex is the part of the brain that controls impulsivity and emotional responses and that it is not fully developed in individuals until they reach their mid-20's. Consequently, adolescents are more likely to be impulsive and respond emotionally instead of rationally, especially in an emotionally

---

[8] See *Miller, supra* note 2.

[9] *Mantich, supra* note 4.

charged situation. They often fail to appreciate the consequences of their actions. And because they are seeking to individuate from their parents, adolescents seek approval from their peer group, which makes them more susceptible to peer influence in their decisionmaking than adults.

Kirk Newring, a licensed psychologist, performed a forensic psychological evaluation of Jackson shortly before Jackson reached age 34. In conducting Jackson's examination, Newring attempted to address the following mitigating factors, which are set forth in Neb. Rev. Stat. § 28-105.02(2) (Reissue 2016):

> (a) The convicted person's age at the time of the offense;
>
> (b) The impetuosity of the convicted person;
>
> (c) The convicted person's family and community environment;
>
> (d) The convicted person's ability to appreciate the risks and consequences of the conduct; [and]
>
> (e) The convicted person's intellectual capacity[.]

In addition to considering the statutory sentencing factors for offenders under age 18, Newring performed a risk assessment for future violence.

During the evaluation, Jackson denied being abused or neglected as a child and he said he had a typical childhood with a young mother and a strong family. A family friend told Newring that Jackson had a mother and stepfather and good support growing up but that he got in with the wrong crowd. Jackson denied having been in a gang but said that he was around gang people. He did not earn any school credits past the 8th grade and was expelled from school in the 10th grade. At age 17, he was placed at the Youth Rehabilitation and Treatment Center in Kearney, Nebraska, after he violated his parole for being a minor in possession of a handgun. He apparently violated his parole by being in possession of a stolen vehicle. He was paroled in May 1999.

An initial classification report from the Department of Correctional Services completed in 2000 stated that Jackson

was believed to be involved in bullying other inmates and characterized him as evasive, having the potential to "assume a negative leadership role" and to continue to be involved in altercations with others.

Newring's report summarized Jackson's misconduct reports. Jackson had approximately 250 misconduct reports as of November 5, 2015. Notably, Jackson had several violations for drug or intoxicant abuse. Jackson had 25 misconduct reports which resulted in a sanction of disciplinary segregation, including threats or fighting, stepping on a staff member's foot, and minor physical contact with staff which was accidental. The majority of Jackson's misconduct reports occurred before reaching age 25. After age 30, he had about 20 misconduct reports. At the mitigation hearing, Newring testified that a comparison of the number of misconduct reports during Jackson's first 5 years of incarceration to his most recent 5 years "suggests maturing."

Based on psychological testing, Newring found no indications that Jackson suffered from a major mental disorder. But Newring diagnosed him as having personality disorders, including adjustment disorder with anxiety, cannabis use disorder in a controlled environment, and antisocial personality disorder. Newring stated that Jackson will meet the criteria for cannabis use disorder until he has demonstrated sobriety in a community setting and that he met the criteria for antisocial personality disorder because of his early childhood misbehavior, rules violations as an adolescent, and institutional misbehavior as a young adult. He stated that Jackson's improved behavior was consistent with research showing that antisocial behavior reduces in an individual's late 30's to early 40's.

Newring further noted that since being incarcerated, Jackson earned his diploma through the GED program in 2008. Jackson also completed several programs, including "Criminal and Addictive Thinking I [and II]" on October 7 and December 12, 2014; "Group Process" on October 2, 2014; "Recovery Issues

I [and II]" on October 6 and December 9, 2014; "Within My Reach Relationship and Communication Program" on October 15, 2014; "Relapse Prevention I [and II]" on December 9, 2014, and February 9, 2015; "Special Issues" on February 10, 2015; "Long Term Residential Substance Abuse Treatment Program" on February 11, 2015; "Most Improved" in the substance abuse unit from December 2014 through February 2015; "Psychology of Incarceration" on February 10, 2015; "Character & Paradigms Class" in February 2015; and "Common Sense Parenting" on April 15, 2015.

After he completed the substance abuse program, Jackson was asked to participate as a mentor, because he was a positive role model. Although his discharge summary from the program stated that he might relapse if released because of his long incarceration, his prognosis for recovery was good. He was reclassified from maximum custody to medium custody. He had earned enough credits for community custody status, but that classification was not available for anyone serving a life sentence without parole.

Jackson's IQ was in the average range. A test used to measure academic achievement showed he had reached a 12th grade level of performance or higher in all areas.

Newring noted that Jackson now had strong ties with his family members, who were supportive of him. He believed that Jackson's recent sobriety, employment experience with the Department of Correctional Services, and family ties were strengths for him. He found it unlikely that Jackson would "re-experience that context that led to his crime of conviction," because he no longer abused drugs or wanted to impress his peers "in the thug life." He concluded that Jackson presented a low risk for future acts of violence. At the end of this hearing, the court ordered a presentence investigation report and scheduled the sentencing hearing for April 2016.

During the sentencing hearing, the court received as an exhibit a sentencing brief with attachments from Jackson's attorney. Many of the attachments were letters of support to the

judge from Jackson's friends and family members. One letter was from a man who had taught a "self-betterment cognitive restructuring" class that Jackson had participated in. He said he had known Jackson for 3 years and that when the class was over, he asked Jackson to assist as a lay instructor. He said Jackson had demonstrated considerable willingness to improve himself and had used his time and abilities to help other inmates with decisionmaking and conflict resolution.

Some of the attachments were copies of other resentencing orders for different adolescent offenders or newspaper stories about them. Another attachment was a report by the Violence Policy Center that analyzed 2011 data on black homicide victimization. The report showed that for 2011, the national black homicide victimization rate was 17.51 per 100,000. "For that year, Nebraska ranked first as the state with the highest black victimization rate. Its rate of 34.43 per 100,000 was nearly double the national average . . . ." There were 30 black homicide victims in Nebraska that year. A report by the Department of Health and Human Services showed that in Nebraska, homicide was the leading cause of death for African-Americans who were between the ages of 15 and 34. Attached news reports showed that three of the other individuals alleged to be involved in Perry's murder had been killed. Chillous was killed in a 2005 shooting. Later that year, Cooperrider was killed in a shooting. In 2010, Sommerville was killed in a shooting, McBride was sentenced to prison for possession of cocaine with intent to distribute, and Fulton was sentenced to prison for first degree assault. In 2014, Fulton was again sentenced to prison for weapon offenses.

Jackson's attorney argued that the court should rely on the bill of exceptions from Jackson's trial and not police reports in the presentence investigation report, because Jackson's codefendants had testified inconsistently with their police statements and had been impeached on that basis. Jackson argued that two relevant considerations for resentencing were that the jury had found he did not fire a weapon and that he

had necessarily been convicted of aiding and abetting two principals who were acquitted. He argued that Fulton never identified Jackson as a participant until he saw him sitting with his two codefendants at the preliminary hearing and that Sommerville had a hairstyle that was similar to Jackson's when Perry was killed.

Jackson's attorney argued that under *Miller* and *Montgomery*, the court had to consider Jackson's level of participation in Perry's killing and that he had not personally killed anyone. He also argued that Jackson had grown up in "horrific, crime-producing settings" that were "especially dangerous for young black males." He argued that as an adolescent, Jackson was very vulnerable to negative influences and pressures. He stated he had not asked Jackson to take responsibility and express remorse for the murder because he believed that Jackson was innocent and that sometimes innocent people are convicted. He asked the court not to hold Jackson's claim of innocence against him in light of Cooperrider's and Chillous' acquittals. He argued that Jackson's demonstrated capacity for change was a relevant consideration for resentencing under *Montgomery*. Jackson made a personal statement to underscore the negative influence of his early environment on his bad behaviors and his later ability to take responsibility for improving himself and helping others. He explained the support network he would have upon release and asked for a meaningful chance for parole.

Jackson's attorney distinguished the facts of other cases in which the court had resentenced an adolescent offender to a lengthy term of imprisonment. For example, he pointed out that unlike Jackson, the offender in *Mantich* was convicted of using a weapon to commit a felony. He recommended that the court resentence Jackson to a term of 40 to 50 years' imprisonment with credit for time served. This sentence would have resulted in Jackson's serving another 3½ years before he was eligible for parole and another 8½ years before his mandatory discharge.

The State argued that this court had held the evidence was sufficient to support Jackson's conviction for first degree murder and that this conviction was the crime for which Jackson was being resentenced. The deputy county attorney emphasized that his guilt was not at issue. She focused on Fulton's testimony that he had no doubt Jackson had shot Perry and that Jackson had hit Perry in the head first. She stressed that Jackson had left the scene and returned with a gun. And she argued that the court had to consider Jackson's age when Perry was killed, because he was only "a couple months away from not receiving the benefit of *Alabama v. Miller*." She argued that most of the accolades Jackson had received while incarcerated occurred after *Miller* was issued and that even after *Miller*, he had received 22 misconduct reports. She argued that Newring had also assessed adolescent offenders to have a low risk of future violence in two other cases and that he "always considered the defendant's version of the facts rather than the facts in the record."

The court stated from the bench that except "for about 49 days, we wouldn't even be here" and thus Jackson would not have had a chance at parole. It set out the statutory factors that it must consider, including the "person's age, the impetuosity of the convicted person, the defendant's family [and] community environment, his ability to appreciate the risks and consequences of the conduct, [and] the convicted person's intellectual capacity," as well as the report Newring prepared for the court.

The court did not restate the facts of the crime or Jackson's level of participation in the crime. It distinguished the resentencing of the defendant in *Mantich* and another offender, because those crimes involved random acts of violence and a "chance encounter with evil." The court went on to state, "But we still have a person here who is dead, and your client, the defendant, was convicted of his murder, and so I think anything but a substantial period of incarceration would be inappropriate." The court stated that it had crafted a sentence

that would allow Jackson to work toward a future release after a substantial additional period of incarceration. It resentenced Jackson to 60 to 80 years' imprisonment with credit for the 6,044 days that he had served. The court calculated that Jackson would be eligible for parole in about 13½ years. Jackson timely appealed.

## ASSIGNMENT OF ERROR

Jackson assigns that the district court abused its discretion in imposing an excessive sentence because it failed to properly consider the applicable legal principles.

## STANDARD OF REVIEW

[1,2] An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court.[10] A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.[11]

## ANALYSIS

[3,4] In *State v. Nollen*,[12] we set forth the law on the sentencing of juvenile offenders. We noted that in *Graham v. Florida*,[13] the U.S. Supreme Court held that it is unconstitutional for a State to impose a sentence of life imprisonment without parole on a juvenile convicted of a nonhomicide offense and that the Constitution required that those juveniles be given "'some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.'"[14]

---

[10] *State v. Mantich*, 295 Neb. 407, 888 N.W.2d 376 (2016).

[11] *Id.*

[12] *State v. Nollen*, 296 Neb. 94, 892 N.W.2d 81 (2017).

[13] *Graham v. Florida*, 560 U.S. 48, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010).

[14] *Nollen, supra* note 12, 296 Neb. at 118, 892 N.W.2d at 97, quoting *Graham, supra* note 13.

[5,6] We also noted that in *Miller*,[15] the Court declined to extend a categorical bar of no life-without-parole sentences to juveniles convicted of homicide. Instead, the U.S. Supreme Court held that a sentencer must "'take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.'"[16]

[7] The U.S. Supreme Court, in *Montgomery v. Louisiana*, held that the prohibition in *Miller* of mandatory life imprisonment without parole for juvenile offenders announced a new substantive rule.[17] The Court further held that when a new substantive rule of constitutional law controls the outcome of a case, the federal Constitution requires state collateral review courts to give retroactive effect to that rule.[18]

As a result of the *Miller* holding, our Legislature amended Nebraska's sentencing laws for juveniles convicted of first degree murder.[19] The new sentencing statute mandates that juveniles convicted of first degree murder are to be sentenced to a "maximum sentence of not greater than life imprisonment and a minimum sentence of not less than forty years' imprisonment."[20] In determining the sentence, the sentencing judge must "consider mitigating factors which led to the commission of the offense."[21] Section 28-105.02(2) sets forth a nonexhaustive list of mitigating factors for the court to consider.

The crux of Jackson's argument is that *Miller* and *Montgomery* require resentencing courts to consider the circumstances of the offense and the extent of the defendant's

---

[15] See *Miller, supra* note 2.

[16] *Nollen, supra* note 12, 296 Neb. 118, 892 N.W.2d at 97, quoting *Miller, supra* note 2.

[17] *Montgomery, supra* note 3.

[18] *Id.*

[19] See § 28-105.02.

[20] § 28-105.02(1).

[21] § 28-105.02(2).

participation, the defendant's immaturity and vulnerability to negative influences at the time of the offense, and the defendant's maturation and rehabilitation since the time of the offense.

[8] As we stated in *Nollen*, a juvenile offender convicted of a homicide offense may be sentenced to life imprisonment without parole so long as the sentencer considered specific, individualized factors before handing down that sentence.[22] Here, Jackson was not sentenced to life imprisonment without parole, but to imprisonment for a term of years that allows for parole eligibility.

Furthermore, the record indicates that a full mitigation hearing was held prior to sentencing at which both the State and Jackson were given an opportunity to present evidence. The sentencing court heard from two witnesses called by Jackson and received numerous exhibits offered by Jackson. The court also ordered a presentence investigation, which gave Jackson the ability to present his own written statement as well as various reference letters from his family, friends, and acquaintances.

During the sentencing hearing, the district court stated that it had to consider the fact that a jury convicted the defendant of murder in the first degree. However, the court also stated that it had to consider the mitigating factors set forth in § 28-105.02(2), as well as the psychological evaluation completed by Newring. As a result, we conclude that Jackson's sentence does not violate *Miller* and that therefore, Jackson's lone assignment of error is without merit.

Jackson further argues that the district court erred because it did not consider and make findings concerning (1) the circumstances of the offense and the extent of Jackson's participation, (2) Jackson's immaturity at the time of the offense, (3) Jackson's vulnerability to negative influences at the time

---

[22] *Nollen, supra* note 12.

of the offense, and (4) Jackson's demonstrated maturity and rehabilitation since the time of the offense.

However, in *State v. Mantich*, we held that there was no language in *Miller*, nor anything in our case law or in § 28-105.02, that would require specific factfinding at sentencing.[23] We further held that "the Legislature has set forth the sentencing procedure applicable to juveniles who have committed homicide offenses."[24] "That procedure is consistent with *Miller* and with the Eighth Amendment as it is currently interpreted by the U.S. Supreme Court."[25]

[9] The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observations of the defendant's demeanor and attitude and all of the facts and circumstances surrounding the defendant's life.[26] As a result, upon our review of the record, we conclude that Jackson's sentence was in accordance with both *Miller* and § 28-105.02 and therefore find Jackson's additional arguments to be without merit.

## CONCLUSION

The sentence of the district court is affirmed.

AFFIRMED.

---

[23] *Mantich, supra* note 10.

[24] *Id.* at 418, 888 N.W.2d at 384.

[25] *Id.*

[26] *Nollen, supra* note 12.